# United States Court of Appeals
## For the First Circuit

No. 03-2604

ALLIANCE TO PROTECT NANTUCKET SOUND, INC.;
RONALD G. BORJESON; WAYNE G. KURKER; SHAREEN DAVIS;
ERNEST R. ELDREDGE; DAVID ELLSWORTH; ROBERT HAZELTON;
OSTERVILLE ANGLERS CLUB, INC.; HYANNIS ANGLERS CLUB, INC.,

Plaintiffs, Appellants,

v.

UNITED STATES DEPARTMENT OF THE ARMY; THOMAS E. WHITE, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF THE ARMY; UNITED STATES ARMY
CORPS OF ENGINEERS; LT. GENERAL ROBERT B. FLOWERS, IN HIS
OFFICIAL CAPACITY AS CHIEF OF ENGINEERS FOR THE UNITED STATES
ARMY CORPS OF ENGINEERS; COLONEL THOMAS L. KONING, IN HIS
OFFICIAL CAPACITY AS DISTRICT ENGINEER FOR THE UNITED STATES
ARMY CORPS OF ENGINEERS; CAPE WIND ASSOCIATES, LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

Benjamin S. Sharp, with whom Donald C. Baur, Perkins Coie LLP,
Franklin H. Levy and Duane Morris, LLP, were on brief, for
appellants.
David C. Shilton, Attorney, United States Department of
Justice, with whom Thomas L. Sansonetti, Assistant Attorney
General, Environment and Natural Resources Division, Gerard T.
Leone, Acting United States Attorney, Anton P. Giedt, Assistant

United States Attorney, <u>Jon M. Lipshultz</u>, <u>John A. Bryson</u>, and <u>Richard Santino</u>, of cousel, Army Corps of Engineers, Concord, MA, were on brief, for the federal appellees.

<u>Timothy J. Dacey</u>, with whom <u>Kurt W. Hague</u> and <u>Goulston & Storrs, P.C.</u>, were on brief, for appellee Cape Wind Associates, LLC.

_____

February 16, 2005

_____

**TORRUELLA, Circuit Judge**.  On November 20, 2001, Cape Wind Associates, L.L.C. ("Cape Wind") submitted an application to the U.S. Army Corps of Engineers ("Corps") for a navigability permit under Section 10 of the Rivers and Harbors Act of 1899 ("Section 10"), 33 U.S.C. § 403,[1] to construct and operate an offshore data tower in an area of Nantucket Sound known as Horseshoe Shoals.  Horseshoe Shoals is located on the Outer Continental Shelf ("OCS"), land subject to federal jurisdiction and control under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331.

The proposed tower was to consist of a platform and a fixed monopole approximately 170 feet high, supported by three steel piles driven into the ocean floor.  Various instrumentation was to be attached to the data tower in order to gather data for use in determining the feasibility of locating a wind energy plant on Horseshoe Shoals.  A separate permit application for the wind energy plant -- a complex originally proposed to include 170 wind turbines with blade rotors rising 423 feet above mean sea level, occupying twenty-six square miles of Horseshoe Shoals -- was submitted to the Corps in November 2001.  That application is not at issue in the instant appeal, and we therefore will not engage in

---

[1]  Section 10 delegates authority to the Corps to issue permits for projects that impact on the navigability of United States waters. 33 U.S.C. § 403.

any analysis of the Corps's authority to permit construction of the wind energy plant.

On December 4, 2001, the Corps announced that it was considering Cape Wind's application for the data tower, and invited the public to submit comments during a period that included two public hearings and ended on May 13, 2002. On August 19, the Corps issued a Section 10 permit authorizing Cape Wind to construct and maintain the data tower, subject to the imposition of sixteen special conditions, including that Cape Wind remove the data tower within five years, that it post a $300,000 bond for emergency repairs or removal, and that it share the data collected with, and permit the installation of additional data-gathering equipment by, government agencies, research institutions, and others. Department of the Army Permit No. 199902477 (Aug. 19, 2002). The permit was accompanied by an Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI"), as required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4331-32.

Appellants subsequently filed an action against the Corps in the District of Massachusetts, arguing that (1) the Corps lacked authority to issue a Section 10 permit for the data tower; (2) the Corps acted arbitrarily and capriciously, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), by granting Cape Wind's permit application in spite of Cape Wind's lack of property rights on the OCS; and (3) the Corps failed to

comply with NEPA requirements for evaluating the data tower's environmental impacts. Upon the receipt of cross motions for summary judgment, the district court granted summary judgment in favor of the Corps and intervenor Cape Wind. We review that decision de novo, construing the evidence in the light most favorable to appellants. See Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001). We will uphold the grant of summary judgment if there is no genuine issue of material fact and appellees are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We affirm the decision of the district court.

## I. Discussion

## A. Corps jurisdiction

The reach of the Corps's Section 10 permitting authority on the OCS turns on a question of statutory interpretation. Congress passed OCSLA in 1953 to assert federal jurisdiction over the OCS and to establish a regulatory framework for the extraction of minerals therefrom. See 43 U.S.C. § 1332; see also Ten Taxpayer Citizens Group v. Cape Wind Assocs., 373 F.3d 183, 188 (1st Cir. 2004) ("A major purpose of the OCSLA was to specify that federal law governs on the [OCS] . . . .") (internal quotation marks omitted). Accordingly, OCSLA extended the Corps's Section 10 regulatory authority "to prevent obstruction to navigation in the navigable waters of the United States . . . to artificial islands and fixed structures located on the [OCS]." 43 U.S.C. § 1333(f)

-5-

(1953). In 1978, this grant of authority was amended to apply instead to "the artificial islands, installations, and other devices referred to in subsection (a) of this section." 43 U.S.C. § 1333(e) (2004). Subsection (a), in turn, extends federal jurisdiction to:

> all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom, or any such installation or other device (other than a ship or vessel) for the purpose of transporting such resources.

Id. at § 1333(a)(1) (emphasis supplied). Appellants argue that the clause "which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom," is restrictive, and limits the Corps's permitting authority on the OCS to structures related to the extraction of mineral resources.[2] Thus, they argue, the Corps lacked authority to grant a Section 10 permit for construction of Cape Wind's data tower. The Corps, on the other hand, has determined that its Section 10 authority "was extended to artificial islands, installations, and other devices located on the seabed, to the seaward limit of the [OCS], by

---

[2] While the term "resources" is not defined in OCSLA, "exploration," "development," and "production" are all defined in terms of "mineral," which is in turn defined as "includ[ing] oil, gas, sulphur, geopressured-geothermal and associated resources, and all other minerals which are authorized by an Act of Congress to be produced from 'public lands'." 43 U.S.C. § 1331(k), (l), (m), (q).

-6-

section 4(f) of [OCSLA] as amended."  33 C.F.R. § 320.2(b) (internal citation omitted).

The district court determined that the "which may be" clause of Subsection (a) was not restrictive. See Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army, 288 F. Supp. 2d 64, 75 (D. Mass. 2003) (finding that OCSLA's text supports the Corps's position that Section 10 jurisdiction extends to all OCS structures "including, but not limited to, those that 'may be' used to explore for, develop, or produce resources" (quoting 43 U.S.C. § 1333(a)(1)) (emphasis supplied by district court)). Thus, the district court held, the Corps has authority to grant a Section 10 permit for all structures on the OCS, regardless of their function.

We find the statutory text in question ambiguous. It is not apparent whether the reference to Subsection (a) inserted into Subsection (e) in 1978 refers to "all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed," 43 U.S.C. § 1333(a)(1), or only to all such installations used to explore, develop or produce resources. In light of this ambiguity, the Corps and Cape Wind invite us to defer to the Corps's interpretation of its authority, see 33 C.F.R. § 320.2(b), under the Chevron doctrine. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). In this case, however, we find it unnecessary to reach the question of

Chevron deference because legislative history reveals, with exceptional clarity, Congress's intent that Section 10 authority under OCSLA not be restricted to structures related to mineral extraction.[3]  See id. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); Strickland v. Comm'r, ME Dept. of Human Servs., 48 F.3d 12, 19-20 (1st Cir. 1995) (evaluating legislative history to determine whether Congressional intent was unambiguously expressed).

In the conference report for the 1978 OSCLA amendments, Congress explained that the changes to Subsection (e)

> were technical only and there was no intent to change present law.  The existing authority of the Corps of Engineers . . . applies to all artificial islands and fixed structures on the [OCS], whether or not they are erected for the purpose of exploring for, developing, removing and transporting resources therefrom.  The

---

[3]  Appellants' argument that the district court erred by elevating the importance of legislative history to supercede that of the plain language of OCSLA is without merit in this case.  Even were the text less ambiguous, a reviewing court may consider legislative history to determine "whether there is clearly expressed legislative intention contrary to [the statutory] language, which would require [the court] to question the strong presumption that Congress expresses its intent through the language it chooses." INS v. Cardoza-Fonseca, 480 U.S. 421, 432 n.12 (1987)(internal quotation marks omitted); see also Train v. Colorado Public Interest Research Group, Inc., 426 U.S. 1, 10 (1976) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'").

> amendment . . . is not intended to change the
> scope of this authority, but merely to conform
> the description of the types of structures, no
> matter what their purpose, to the types of
> structures listed in subsection (a), namely
> all installations and other devices
> permanently or temporarily attached to the
> seabed. It is not the intention of the
> conferees to limit the authority of the Corps
> [] as to structures used for the exploration,
> development, removal, and transportation of
> resources.

H.R. Conf. Rep. No. 95-1474 ("Conference Report") at 82 (1978), reprinted in 1978 U.S.C.C.A.N. 1674, 1681 (emphasis supplied).[4] Appellants suggest that the intent expressed in the above-quoted language was not that Corps authority be unlimited with regard to the purpose of the structure in question, but rather with regard to

---

[4] The need to bring the types of structures referred to in Subsection (e) into agreement with those referred to in Subsection (a) becomes apparent when one considers the amendments made to the latter in 1978. The original text of Subsection (a) extended federal jurisdiction over "all artificial islands and fixed structures which may be erected thereon for the purpose of exploring for, developing, removing, and transporting resources therefrom." 43 U.S.C. § 1333(a) (1953) (emphasis supplied). Because of the development of relatively impermanent structures, which did not clearly fall within the "fixed structures" rubric, Congress amended Subsection (a) in 1978 to apply instead to "all artificial islands and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom." See H.R. Rep. No. 95-590, at 128 (1977), reprinted in 1978 U.S.C.C.A.N. 1450, 1534 (emphasis supplied) (explaining that change in Subsection (a) was made because "the Committee intends that federal law is . . . to be applicable to all activities on drilling ships, semi-submersible drilling rigs, and other watercraft, when they are attached to the seabed"). The reference to "fixed structures" in the predecessor of the current Subsection (e), 43 U.S.C. § 1333(f) (1953), was accordingly revised to refer instead to those structures "referred to in subsection (a)," 43 U.S.C. § 1333(e) (2005).

different types of structures within the subset of structures related to exploring for, developing, removing or transporting minerals. This interpretation strains the Conference Report language well beyond the meaning it can bear, especially in light of Congress's awareness when it amended OCSLA that the Corps had issued Section 10 permits for OCS structures unrelated to mineral extraction on several occasions between 1953 and 1978, implying its approval of the exercise of such jurisdiction. See Conference Report at 81 ("[The Corps's existing] authority has been used . . . to regulate the construction and location of . . . artificial fishing reefs, radio towers, and a proposed gambling casino which was to be constructed on reefs. It also applies to structures erected for the purpose of exploring for and transporting resources . . . ." (emphasis supplied)). Appellants' efforts to counter this legislative history with language from the Senate Report from the original 1953 OCSLA that could be read to imply a limitation of Corps permitting authority to structures intended for mineral resource development is unavailing. The Corps's current authority is determined by OCSLA as amended in 1978, and the Conference Report addresses Congress's intent at that time. See also United States v. Commonwealth Energy Sys. & Subsidiary Cos., 235 F.3d 11, 16 (1st Cir. 2000) ("The most dispositive indicator of congressional intent is the conference report.").

Congress made clear that "[t]he existing authority of the Corps . . . applies to all artificial islands and fixed structures on the [OCS], whether or not they are erected for the purpose of exploring for, developing, removing, and transporting resources therefrom." Conference Report at 82. This express legislative intent is determinative of the scope of the Corps's authority. Accordingly, we hold that the Corps had jurisdiction to issue a Section 10 permit for Cape Wind's data tower.

## B. Property interest

Appellants argue that the Corps failed to properly consider Cape Wind's lack of a property interest in the OCS land on which it sought to build the data tower when it granted the Section 10 permit.

### 1. Agency regulations

Appellants first argue that the Corps has a regulation, 33 C.F.R. § 325.1(d)(7), that requires that the applicant actually have necessary property rights in the area of the project and make an affirmation to that effect. The regulation states: "The application must be signed by the person who desires to undertake the proposed activity . . . . The signature of the applicant . . . will be an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application . . . ." Id. Of course, the regulation does not say that the applicant must actually possess, or possess in the

-11-

future, the requisite property rights, but only that the applicant must make an affirmation to that effect.

The Corps responds to appellants' argument by referring to another of its regulations, which provides that:

> A [Corps] permit does not convey any property rights . . . or any exclusive privileges. Furthermore a [Corps] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application. The [Corps] will not enter into disputes but will remind the applicant of the above. The dispute over property ownership will not be a factor in the Corps public interest decision.

33 C.F.R. § 320.4(g)(6) (emphasis supplied); see also Environmental Assessment and Statement of Findings at 13 (Aug. 19, 2002) (paraphrasing § 320.4(g)(6) in response to comments about Cape Wind's lack of property interest).

The Corps indicated in its response to comments about Cape Wind's lack of a property interest, and articulated more fully during the course of this litigation, that it deems § 320.4(g)(6) to require only that it remind applicants of their need to possess all requisite property interests. In the Corps's view, § 320.4 (g)(6)'s requirement that a "dispute over property ownership will not be a factor in the Corps public interest decision" applies to preclude consideration of a dispute over the adequacy of an

-12-

applicant's property interests in the project site. See Environmental Assessment at 14.

Appellants argued before the district court that the requirement that applicants affirm possession of the requisite property interests for the proposed activity, 33 C.F.R. § 320.4 (g)(6), means that such property interests must, in fact, be possessed by the applicant. Because Cape Wind had no property interest in the proposed data tower site, nor could it obtain such an interest under current law, its Section 10 permit application ought to have been denied. The district court rejected this argument, deferring instead to the Corps's interpretation that § 320.4(g)(6) requires only an affirmation from the applicant, which Cape Wind provided. According to the district court, § 320.4 (g)(6), as interpreted by the Corps, fit in as "part of a [regulatory] scheme designed to keep the Corps out of property disputes." Alliance, 288 F. Supp. 2d at 77. Accordingly, not only did the regulation relieve the Corps of any obligation to consider the sufficiency of Cape Wind's property interests, but it precluded such consideration altogether. Id. at 77-78.

The face of § 320.4(g)(6) evidences the Corps's intent not to be involved in private property disputes. And as to disputes over public land, § 320.4(g)(6), by its own terms, says that a permit does not "convey any property rights . . . or any exclusive privileges." Thus, the regulation does not purport to

address disputes over public property, but rather attempts to insulate the Corps from addressing those disputes. Appellants' argument that the regulations impose an obligation on the Corps in a Section 10 case to resolve disputes over the ownership of public (or private) property is simply wrong.

Even if the regulation did not clearly support the Corps's interpretation on its face, the Corps's interpretation would nonetheless be entitled to deference. See Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (holding that agency's interpretation during administrative adjudication of its own regulations "must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation") (internal quotation marks omitted); South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 98 (1st Cir. 2002) (deference appropriate where language of regulations "admits of differing interpretations, and the [agency] chooses reasonably among them"). Deference would be appropriate even though the interpretation was offered in a less formal session than the interpretation in Thomas Jefferson. See Auer v. Robbins, 519 U.S. 452, 462 (1997) (deferring to agency interpretation contained in amicus brief submitted in dispute between private parties); see also Christensen v. Harris County, 529 U.S. 576, 588 (2000) (limiting Auer deference to ambiguous regulations); United States v. Hoyts Cinemas Corp., 380 F.3d 558, 567 (1st Cir. 2004) (affording "some weight" to Justice Department's interpretation of

its regulation "even though the Department's gloss is offered only in a brief rather than in some more formal manner").[5]

We find that the Corps's reading of § 320.4(g)(6) is a reasonable one: the regulation's text states first that an applicant must affirm possession of the requisite property interests, then that the Corps "will not enter into disputes but will remind the applicant of the above" -- that is, the Corps will remind the applicant of its need to possess the requisite property interest. The regulation next states that "[t]he dispute over property ownership will not be a factor in the Corps public interest decision." "The dispute" refers back to the category of disputes that result in a reminder of the need to obtain all required property interests. It is reasonable, in this context, to determine that "the dispute over property ownership" into which the Corps may not enter includes a dispute over whether the applicant has acquired all requisite property interests -- that is, a dispute over the sufficiency of the applicant's property interests. Further, the goal of preventing the Corps from expending its

---

[5] While deference is not due to interpretations that are "post hoc rationalizations offered by an agency seeking to defend past agency action against attack," Auer, 519 U.S. at 462, or to interpretations that have varied erratically over time, see South Shore, 308 F.3d at 102, we find neither of these stumbling blocks in the instant case. The Corps's interpretation was issued simultaneously with the permit, and so does not appear to be a post hoc rationalization. Further, the Corps has consistently taken the position that nothing in Section 10 requires it to resolve property disputes.

-15-

resources on evaluating the legal question of the sufficiency of property interests is a reasonable one. This is so whether the dispute is over the sufficiency of the applicant's interests as opposed to those of other private property holders in the area, or as opposed to those of the federal government, especially since the Corps is permitted to consider the potential impact of the project on others' property interests during its public interest review. See 33 C.F.R. § 320.4(a)(1) (listing "considerations of property ownership" as factor to consider in determining whether, and under what conditions, to grant permit). Accordingly, we find that the district court did not err in deferring to the Corps's interpretation of its regulations and its decision not to evaluate the sufficiency of Cape Wind's property interests in the OCS.

## 2. Public interest review

Appellants also argue that the Corps's duty to act in the public interest required it to consider the effect that granting Cape Wind's application would have on the federal government's interest in the OCS. The Corps is not shielded from this line of attack by its reliance on § 320.4(g)(6). Appellants properly point out that the Corps must consider, despite § 320.4(g)(6), the impact of a permit issuance on federal property rights in various ways, as part of its general public interest review. See 33 C.F.R. § 320.4 (a)(1) (impact of project on "considerations of property ownership" must be a factor in the Corps's analysis); United States v. Alaska,

-16-

503 U.S. 569, 590-91 (1992) (§ 320.4(g)(6) does not prohibit Corps from considering effect of proposed port construction on federal-state boundary in submerged waters, under 33 C.F.R. § 320.4(f)). Here, as we explain below, the Corps reasonably found that the data tower's impact on federal property rights would be "negligible," Environmental Assessment at 4, and thus appellants' public interest argument fails.

### 3. Reliance on Cape Wind's affirmation

Finally, appellants argue that Cape Wind's affirmation that it possessed the requisite property interests was obviously false, as there exists no mechanism by which private entities can obtain a license to construct a data tower on the federally controlled OCS. The Corps's grant of a Section 10 permit on the basis of this false affirmation was therefore arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Again, this line of attack is not deflected by reference to Corps regulations. Appellants note that agency decisions based on false factual information run afoul of the Administrative Procedure Act. See, e.g., Missouri Serv. Comm'n v. FERC, 337 F.3d 1066, 1075 (D.C. Cir. 2003) ("Reliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking.").[6]

---

[6] Indeed, at oral argument, the Corps's attorney stated that if an applicant sought a permit to build a structure for extraction purposes under OCSLA and affirmed possession of all requisite

-17-

Appellants' argument hinges on the veracity of Cape Wind's affirmation, which in turn depends, appellants argue, on whether authorization in addition to a Section 10 permit is necessary for construction of the data tower.[7] The first part of our opinion holds that a Section 10 permit is <u>necessary</u> for all structures on the OCS unless otherwise indicated by law, but does not determine whether such a permit is <u>sufficient</u> to authorize building on the federally controlled OCS.

Whether, and under what circumstances, additional authorization is necessary before a developer infringes on the federal government's rights in the OCS is a thorny issue, one that is unnecessary to delve into in the instant case. The data tower at issue here involves no real infringement on federal interests in the OCS lands. To start, the structure is temporary, of five

property interests, but was refused a lease by the Department of the Interior, then the Corps would consider the lack of an Interior lease and would deny the permit.

[7] Congress has established regulatory schemes for certain types of structures on the OCS. OCSLA itself sets up a system of oil and gas leases that require both a lease from the Secretary of the Interior as well as a Corps permit. <u>See</u> 43 U.S.C. § 1331 <u>et seq.</u> The Ocean Thermal Energy Conversion Act of 1980, 42 U.S.C. § 9101 <u>et seq.</u>, authorizes the creation of large thermal energy plants by requiring a license from the National Oceanic and Atmospheric Administration, while the Coast Guard is authorized to make rules ensuring safety of navigation. <u>Id.</u> §§ 9111, 9118. The Deepwater Ports Act of 1975, 33 U.S.C. § 1501 <u>et seq.</u>, requires a license from the Secretary of Transportation in order to authorize construction of deepwater ports. <u>Id.</u> § 1503. The National Fishing Enhancement Act of 1984, 33 U.S.C. § 2101 <u>et seq.</u>, in contrast, does not require approval for artificial reefs placed on the OCS beyond a Section 10 permit. <u>Id.</u> § 2104.

years' duration, more than two of which have now passed. The tower is also not exclusive -- it must accept data collection devices form the government and others, and it must give the data to the government. The tower is a single structure, and it provides valuable information that the Corps requires in order to evaluate the larger wind energy plant proposal. The Corps's public interest evaluation of the data tower resulted in a finding of "negligible impact" on property ownership and stated that collection of the data is in the public interest. Environmental Assessment at 4-5. It is inconceivable to us that permission to erect a single, temporary scientific device, like this, which gives the federal government information it requires, could be an infringement on any federal property ownership interest in the OCS.

Thus, the question of infringement of federal property interests is entirely hypothetical in this case. As a result, appellants' arguments based both on the arbitrary and capricious provision in the APA and the public interest standards discussed in Alaska are misplaced. We do not here evaluate whether congressional authorization is necessary for construction of Cape Wind's proposed wind energy plant, a structure vastly larger in scale, complexity, and duration, which is not at issue in the present action. Our analysis is limited to whether additional Congressional authorization is necessary for the data tower, which

does not infringe on any federal property interest, and we conclude that it is not.

## C.   National Environmental Policy Act

The Council on Environmental Quality ("CEQ") is authorized to enact regulations to ensure federal agencies' compliance with NEPA.  See 42 U.S.C. §§ 4342, 4344.  Appellants argue that the Corps violated CEQ regulations by failing to circulate for public comment a draft EA and FONSI.  We evaluate agency action to determine if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A), (C).

CEQ regulations require that an "agency shall involve . . . the public, to the extent practicable, in preparing [an EA]," 40 C.F.R. § 1501.4(b), and that "[a]gencies shall . . . make diligent efforts to involve the public in preparing and implementing their NEPA procedures[,] . . . provide public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected," and "[s]olicit appropriate information from the public," Id. § 1506.6.  Appellants inform us that the Ninth Circuit has held that, under these regulations, "[t]he public must be given an opportunity to comment on draft EAs."  See Citizens for Better Forestry v. United States Dep't of Agric., 341 F.3d 961, 970 (9th Cir. 2003) (quoting Anderson v. Evans, 314 F.3d 1006, 1016 (9th Cir. 2002), opinion

-20-

, 371 F.3d 475 (9th Cir. 2004)). Appellees reject this interpretation, citing contrary precedent from a number of other circuits and noting that the quoted language in Citizens for Better Forestry was dicta. Appellees argue that the Corps met the requirement of involving the public "to the extent practicable" in preparing the EA by issuing public notice of Cape Wind's application, providing a comment period that they later extended to over five months, carrying out two public hearings, noting and responding to public comments in the EA, and conferring with federal and state environmental agencies. We agree. Nothing in the CEQ regulations requires circulation of a draft EA for public comment, except under certain "limited circumstances." 40 C.F.R. § 1501.4(e)(2).

Appellants argue that one of those circumstances[8] applies to this case: A draft FONSI must be made available for public comment when "[t]he nature of the proposed action is one without precedent." Id. § 1501.4(e)(2)(ii). Appellants argue that the data tower proposal is "without precedent" because Nantucket Sound is a pristine, undeveloped area and because "there is no precedent for permitting a privately-owned structure for wind energy, or even related research, on OCS lands." The Corps, however, determined

---

[8] The other circumstance, when "[t]he proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement," § 1501.4(e)(2)(i), has not been argued to apply in this case.

-21-

that "[t]here is precedent for this type of structure in Massachusetts's waters," in the form of a data tower in Martha's Vineyard. Environmental Assessment at 10. The district court agreed, relying on the Corps's findings that while "[t]here are no other similar structures or devices in Horseshoe Shoals," a data tower was permitted in state waters off Martha's Vineyard, and Cape Wind's data tower was "not inconsistent with other pile supported structures in the marine environment in Nantucket Sound." Id. at 2; see Alliance, 288 F. Supp. 2d at 78-79.

We find that the Corps's determination that the data tower is not without precedent, on the basis of physically similar structures in nearby waters, was reasonable. We do not agree with appellants' argument that construction of structures like the data tower on the OCS without additional authorization from Congress is without precedent, but even if that were so, it would suggest only that issuance of the permit is legally unprecedented. The CEQ regulations, however, are designed to address environmental impact. Based on the Corps's findings about the existence of similar pile-driven structures in Martha's Vineyard and near the shore of Nantucket Sound, we can see nothing unprecedented about the way this data tower will impact the environment.[9] Thus, we find that the Corps fully complied with its obligations under NEPA and CEQ

---

[9] To the extent that appellants' arguments are concerned with unprecedented impact of the proposed wind energy plant, that project is not at issue in the current action.

-22-

regulations to engage with the public in preparing the EA and FONSI.

## II. Conclusion

For the reasons stated above, the judgment of the district court is **affirmed**.