# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 11, 2016          Decided July 5, 2016

No. 14-5301

PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY,
ET AL.,
APPELLANTS

TOWN OF BARNSTABLE, MASSACHUSETTS, ET AL.,
APPELLEES

v.

ABIGAIL ROSS HOPPER, ACTING DIRECTOR, U.S. BUREAU OF
OCEAN ENERGY MANAGEMENT, ET AL.,
APPELLEES

———

Consolidated with 14-5303

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01073)
(No. 1:10-cv-01067)
(No. 1:10-cv-01079)
(No. 1:10-cv-01238)

———

*Benjamin S. Sharp* argued the cause for appellant Alliance
to Protect Nantucket Sound. With him on the briefs were

*Donald C. Baur*, *Jennifer A. MacLean*, *W. Eric Pilsk*, and *Charles Alan Spitulnik*.

*Eric R. Glitzenstein* argued the cause for appellants Public Employees for Environmental Responsibility, et al.  With him on the briefs was *William S. Eubanks II*.

*Todd D. Lochner* was on the brief for *amici curiae* Cape Cod Marine Trades Association, Inc. and Massachusetts Fishermen's Partnership, Inc. in support of appellants.

*J. David Gunter II*, Attorney, U.S. Department of Justice, argued the cause for federal appellees.  With him on the brief were *John C. Cruden*, Assistant Attorney General, and *Luther L. Hajek*, Attorney.

*Christopher H. Marraro* argued the cause for intervenor Cape Wind Associates, LLC.  With him on the brief was *Geraldine E. Edens*.

Before: MILLETT and WILKINS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: The Cape Wind Energy Project is a proposal to generate electricity from windmills off the coast of Massachusetts.  It calls for the "construction, operation and maintenance . . . of 130 wind turbine generators" in the Horseshoe Shoal region of Nantucket Sound.  The turbines have an estimated life-span of twenty years, and during that time they are expected to generate up to three-quarters of the electricity needs for Cape Cod and the surrounding islands. The project's "underlying purpose" is to help the region achieve

Massachusetts's renewable energy requirements, which "mandate that a certain amount of electricity come from renewable energy sources, such as wind." *See* MASS. GEN. LAWS ch. 25A, § 11F.

Offshore energy providers like Cape Wind must comply with a slew of federal statutes designed to protect the environment, promote public safety, and preserve historic and archeological resources on the outer continental shelf.[1] They must also go through "several regulatory and administrative procedures" to satisfy regulations promulgated under these statutes. *Pub. Emps. for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 85 (D.D.C. 2014), *appeal dismissed sub nom. Pub. Emps. for Envtl. Responsibility v. Cruickshank*, No. 14-5117, 2014 WL 3014869 (D.C. Cir. June 11, 2014).

Cape Wind first sought government approval for its project in 2001 when it filed a permit application with the United States Army Corps of Engineers, the federal agency then regulating outer continental shelf wind energy projects. *See All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 398 F.3d 105, 107 (1st Cir. 2005); 33 U.S.C. § 403. Four years later, the Energy Policy Act of 2005, Pub. L. No. 109-58, § 388(a), 119 Stat. 594, 744, amended the Outer Continental Shelf Lands Act, *see* 43 U.S.C. § 1337(p), and transferred primary regulatory authority

---

[1] "Outer Continental Shelf . . . means all submerged lands lying seaward and outside of the area of lands beneath navigable waters . . . whose subsoil and seabed appertain to the United States and are subject to its jurisdiction and control." 30 C.F.R. § 585.112; *see* 43 U.S.C. § 1301(a) (defining "lands beneath navigable waters"). The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a), grants the United States jurisdiction over this area. *See United Ass'n of Journeymen & Apprentices of Plumbing & Pipe Fitting Indus., AFL-CIO v. Reno*, 73 F.3d 1134, 1135 (D.C. Cir. 1996).

over offshore renewable energy projects to the Bureau of Ocean Energy Management,[2] an agency within the Department of the Interior. *See id.* § 1337(p)(1)(C); 76 Fed. Reg. 64,432, 64,434, 64,459 (Oct. 18, 2011). Since then, this Bureau has promulgated regulations governing the development of "renewable" energy production on the outer continental shelf. *See* 30 C.F.R. § 585.100 *et seq.* ("Renewable Energy and Alternate Uses of Existing Facilities on the Outer Continental Shelf"). The regulations require the Bureau both to collect information about projects and to "consult with relevant [f]ederal agencies," including *inter alia* the United States Coast Guard and the Fish and Wildlife Service. *Id.* § 585.203; *see id.* § 585.600. Although Cape Wind submitted its application before the regulations issued, the Bureau decided that the regulations would nonetheless "be applicable as the Cape Wind Energy Project moves forward through the construction, operation, and decommissioning phases."

Plaintiffs are the Alliance to Protect Nantucket Sound, Public Employees for Environmental Responsibility, and others. They claim that the government violated half a dozen federal statutes in allowing Cape Wind's project to move through the regulatory approval process. *See Pub. Emps.*, 25 F. Supp. 3d at 77-79. The Bureau allegedly violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), the Shelf Lands Act, 43 U.S.C. § 1337(p), the National Historic Preservation Act, 54 U.S.C. § 306108, and the Migratory Bird Treaty Act, 16 U.S.C. § 703(a). The Bureau and the United States Coast Guard allegedly violated the Coast Guard and Maritime Transportation Act, Pub. L. No. 109-241, § 414, 120

---

[2] The Bureau replaced the Minerals Management Service in October 2011. *See Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1126 n.2 (9th Cir. 2012).

Stat. 516, 540 (2006).  The Fish and Wildlife Service allegedly violated the Endangered Species Act, 16 U.S.C. § 1538.

On March 14, 2014, the district court rejected most of these claims and granted partial summary judgment to the government agencies.  *See Pub. Emps.*, 25 F. Supp. 3d at 130.  On November 18, 2014, the court rejected plaintiffs' remaining claims, granted summary judgment, and dismissed the case.  We "review *de novo* the district court's grant[s] of summary judgment," and "apply the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. [§ 706]" to determine whether the government complied with federal law.  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 308 (D.C. Cir. 2013); *see CTIA-Wireless Ass'n v. FCC*, 466 F.3d 105, 113 (D.C. Cir. 2006); *Nat'l Ass'n of Home Builders v. Norton*, 415 F.3d 8, 13 (D.C. Cir. 2005); *Hill v. Norton*, 275 F.3d 98, 102 (D.C. Cir. 2001), *superseded by statute on other grounds*, Migratory Bird Treaty Reform Act, Pub. L. No. 108-447, § 143, 118 Stat. 2809, 3071-72 (2004); *Indep. Petroleum Ass'n of Am. v. Babbitt*, 92 F.3d 1248, 1257 (D.C. Cir. 1996).

I

Plaintiffs challenge the Bureau's decision to issue the lease for Cape Wind's project without first obtaining "sufficient site-specific data on seafloor and subsurface hazards" in Nantucket Sound.  Alliance Br. at 26-27.  They argue that the Bureau violated the National Environmental Policy Act, 42 U.S.C. § 4332, by relying on inadequate "geophysical and geotechnical" surveys.  Alliance Br. at 21.  We agree.

Under NEPA, an agency must "consider every significant aspect of the environmental impact of a proposed action."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983); *see* 42 U.S.C. § 4332(2).  The agency must then "inform the public that

it has indeed considered environmental concerns in its decisionmaking process." 462 U.S. at 97. In other words, agencies must "take a 'hard look' at [the] environmental consequences" of their actions, and "provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). This "hard look" requirement applies to the "authorization or permitting of private actions" like the Cape Wind Project. *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36-37 (D.C. Cir. 2015).

The principal way the government informs the public of its decisionmaking process is by publishing environmental impact statements. *See* 42 U.S.C. § 4332(2)(C). Agencies must "prepare and make publicly available" these statements for all "major [f]ederal actions significantly affecting the quality of the human environment . . .." *Sierra Club*, 803 F.3d at 37. Among other things, impact statements must describe a proposed "action's anticipated direct and indirect environmental effects." 803 F.3d at 37.

In 2004, the Army Corps of Engineers issued a draft impact statement for the Cape Wind project. After the Bureau assumed authority, it reviewed the Corps's draft statement, "identified information requirements and/or issue areas that [were] incomplete," and announced that it would issue its own impact statement. *See* Notice of Intent to Prepare an Environmental Impact Statement, 71 Fed. Reg. 30,693 (May 30, 2006). The Bureau published draft and final impact statements in 2008 and 2009, respectively. *See* 73 Fed. Reg. 3,482 (Jan. 18, 2008); 74 Fed. Reg. 3,034 (Jan. 16, 2009).

Plaintiffs argue that the Bureau's 2009 impact statement is arbitrary and capricious because it does not adequately assess

the seafloor and subsurface hazards of the Sound.[3] They claim that the statement relies on inadequate geological surveys, which according to the Bureau's internal guidance, help determine whether "the seafloor [is] able to support large structures," and whether "important archaeological and prehistoric features [can] be protected." In support, plaintiffs refer to a series of internal Bureau emails describing "the dearth of geophysical data over the entire area" of the proposed wind farm. For example, in December 2006, Richard Clingan, the Bureau geologist overseeing the impact statement's geophysical data section, emailed a list of concerns to the Bureau's "Cape Wind Project Manager," Rodney Cluck, including that "[t]here is no indication that [Cape Wind] ha[s] adequate data to address" various geological hazards, and that Cape Wind's surveys "don't seem to conform (even loosely) to the 'Guidance Notes on Site Investigations for Offshore Renewable Energy Projects' . . .." His emails referred to three surveys conducted for Cape Wind between 2001 and 2005 that the Bureau concedes were "insufficient" to "support approval to construct the project . . .." Defendants Br. at 41. In June 2007, Clingan repeated his "geophysical data concerns," and Rodney Cluck forwarded to the Bureau's "NEPA Coordinator" Clingan's conclusion that

---

[3] Plaintiffs also argue that the 2009 statement is arbitrary and capricious because its "Oil Spill Response Plan" "ignores the . . . risk of an oil tanker collision with a turbine or another vessel," and does not adequately explain the estimated oil spill response time. *See* 30 C.F.R. § 254 *et seq.* Plaintiffs have made markedly different arguments on this issue, first to the district court and later to this court, and have therefore forfeited most of those arguments. *See Potter v. District of Columbia*, 558 F.3d 542, 549-50 (D.C. Cir. 2009). For example, in their motion for summary judgment they argued that "8 to 12 hours" is too slow a response time, but in their appellate briefs they challenged a change in the estimated response time between the draft and final response plans. To the extent any arguments have survived, the impact statement comprehensively addresses them.

Cape Wind "has not acquired sufficient geophysical data and information to adequately delineate in detail geologic hazards and conditions in the vicinity (1000m radius) of even one proposed turbine location . . .."

The Bureau downplays the significance of its geologist's concerns, attributing them to "a robust internal debate," and claiming that there was at least sufficient data "to support [the Bureau's] *initial* decision . . . to offer a lease," if not to justify final construction of the windmills. Defendants Br. at 41-42. The Bureau also disputes whether Clingan actually harbored such serious concerns, noting that his email "acknowledge[s] that the data . . . constitute[s] 'an informative reconnaissance-level survey of the project area . . ..'" Defendants Br. at 40.[4]

We do not think the Bureau has "fulfilled its duty to take a 'hard look' at the geological and geophysical environment" in Nantucket Sound. Defendants Br. at 40. NEPA requires federal agencies to prepare impact statements for all "major [f]ederal actions significantly affecting the quality of the human environment." *Sierra Club*, 803 F.3d at 37. The Bureau does not contest that issuing a renewable energy lease constitutes a major federal action. *Compare Pub. Emps.*, 25 F. Supp. 3d at 126; Alliance Mot. Summ. J. at 80-83, No. 1:10-cv-01067-RBW (D.D.C. June 14, 2013), ECF No. 283. Therefore, the question is whether the Bureau "consider[ed] every significant aspect of the environmental impact" of the project, including the subsurface environment. *Balt. Gas*, 462 U.S. at 97. The Bureau distinguishes between the "*initial* decision" to issue a lease and

---

[4] The Bureau's quotation is a bit misleading. Clingan's full email says that "[*a*]*t first impression*, [Cape Wind] conducted an informative reconnaissance-level survey of the project area," but "[u]nfortunately, [Cape Wind] has not acquired sufficient geophysical data" on Nantucket Sound. Joint Appendix 1635 (italics added).

the consequences of that decision. Defendants Br. at 42. Cape Wind also points out that the impact statement required "additional geophysical . . . surveys" once the project was authorized, and claims these surveys were completed in 2012. *See* Cape Wind Intervenor Br. at 6. But there is no evidence the Bureau relied on any additional surveys in its impact statement, and NEPA does not allow agencies to slice and dice proposals in this way. Agencies must take a "hard look" at the environmental effects of a major federal action "*and consequences* of that action." *Robertson*, 490 U.S. at 352 (italics added). The impact statement must therefore look beyond the decision to offer a lease and consider the predictable consequences of that decision. By relying solely on data so roundly criticized by its "own experts," the Bureau failed to fulfill this duty. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2011). Of course, an agency need not be clairvoyant. In some cases it may be appropriate for an impact statement to provide for ongoing monitoring in order to gather more data. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010). But that does not excuse the Bureau from its NEPA obligation to gather data about the seafloor. Without adequate geological surveys, the Bureau cannot "ensure that the seafloor [will be] able to support" wind turbines.

The Bureau therefore violated NEPA, but that does not necessarily mean that the project must be halted or that Cape Wind must redo the regulatory approval process. *See, e.g.*, *Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1080-81 (9th Cir. 2010); *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010). To decide whether "the project should be halted pending completion of an [impact statement]," we must perform a "particularized analysis of the violations that have occurred," "the possibilities for relief," and "any countervailing considerations of public interest," including

"the social and economic costs of delay . . .." *NRDC v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1272 (D.C. Cir. 1979) (internal quotation marks omitted); *see also Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 512-13 (D.C. Cir. 1974). Delaying construction or requiring Cape Wind to redo the regulatory approval process could be quite costly. The project has slogged through state and federal courts and agencies for more than a decade. *See, e.g.*, *All. to Protect Nantucket Sound, Inc. v. U.S. Dep't of Army*, 288 F. Supp. 2d 64 (D. Mass. 2003), *aff'd*, 398 F.3d 105 (1st Cir. 2005); *All. to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd.*, 858 N.E.2d 294 (Mass. 2006). Meanwhile, Massachusetts's renewable energy requirements continue to increase. *See* MASS. GEN. LAWS ch. 25A, § 11F. Allowing the project to move forward could help meet these requirements. On the other hand, it would be imprudent to allow Cape Wind to begin construction before it can "ensure that the seafloor [is] able to support" its facilities. Cape Wind has "no prior experience developing/operating offshore wind farms," and the construction site "lie[s] in the frontier areas of the [outer continental shelf,] where *detailed* geological, geophysical, and geotechnical data and information is generally lacking." Therefore, we will vacate the impact statement and require the Bureau to supplement it with adequate geological surveys before Cape Wind may begin construction.[5] We will not, however, vacate Cape Wind's lease or other regulatory approvals based on this NEPA violation.

Plaintiffs argue that Cape Wind's failure to complete the surveys dooms the project for another reason. They say that Bureau regulations require Cape Wind to complete the surveys

---

[5] If the Bureau believes that Cape Wind's 2012 surveys adequately address the geological concerns discussed above, it may refer to them in its revised impact statement. *See* Cape Wind Intervenor Br. at 6.

before the Bureau can approve Cape Wind's "Construction and Operations Plan." 30 C.F.R. § 585.620. The Bureau concedes that it would ordinarily require Cape Wind to "submit the results of" geological surveys with its construction plan, but that the Bureau granted a regulatory departure to provide Cape Wind with more time to secure financing. 30 C.F.R. § 585.626; *see id.* § 585.103. Plaintiffs respond that the Bureau "cannot 'depart' from or waive [the surveys] because doing so [would] deprive[] the agency of information required to comply with" NEPA, the Shelf Lands Act, the National Historic Preservation Act, and 30 C.F.R. § 585.103(b)(2), which requires any departure to "[p]rotect the environment and the public health and safety to the same degree as if there were no approved departure." Alliance Br. at 37. Alternatively, they claim that even if the Bureau can grant this departure, the Bureau did not actually do so because the departure was not in writing. We find neither argument persuasive.

Bureau regulations require offshore energy providers to submit "detailed information" with their construction plans to "assist [the Bureau] in complying with NEPA and other relevant laws." 30 C.F.R. § 585.627(a). This includes information about "geology[] and shallow geological . . . hazards." *Id.* § 585.627(a)(1). Plaintiffs interpret these regulations to mean that "those statutes require" energy providers to submit geological surveys before the Bureau can approve a construction plan. Alliance Br. at 36. Their interpretation adds a timing requirement that does not exist in the regulations or the statutes. Section 585.627(a) says only that the information will "assist [the Bureau] in complying with" federal statutes. Similarly, the federal statutes plaintiffs invoke do not discuss the construction plan approval phase at all. For example, the Shelf Lands Act requires the Bureau to "provide[] for . . . safety" and "protection of the environment" when overseeing the project, 43 U.S.C. § 1337(p)(4)(A)-(B); *see also* 30 C.F.R. § 585.103(b)(1)-(2); the

Preservation Act requires the Bureau to "take into account the effect of the [project] on any historic property," 54 U.S.C. § 306108; and NEPA requires the Bureau to assess "the environmental impact of the [project]." 42 U.S.C. § 4332(2)(C)(i). Although these statutes may require Cape Wind to obtain subsurface data before beginning construction, they do not independently require geological surveys before the Bureau can approve a construction plan. The departure delayed the surveys, but the Bureau still required Cape Wind to complete them before "commencing construction or otherwise disturbing the seafloor . . .." *Pub. Emps.*, 25 F. Supp. 3d at 107. That is enough to satisfy the federal statutes and 30 C.F.R. § 585.103(b)(2).[6]

Alternatively, plaintiffs argue that the Bureau violated its own regulations because "[t]here is no written departure in the record." Alliance Br. at 37; *see* 30 C.F.R. § 585.103(b)(4). That is not so. In a 2010 letter to Cape Wind, the Bureau explained that it was willing to grant additional time "to obtain the financing" for the surveys, which were projected to cost "approximately $30 million," and that as long as the construction plan was "otherwise satisfactory," the Bureau "would approve a departure from its regulations . . .." Plaintiffs claim that this letter did not represent an actual departure, but rather an invitation to Cape Wind to request one. Their interpretation is overly formalistic. The Bureau may "prescribe or approve departures" in order to facilitate "appropriate activities" on an offshore energy lease. 30 C.F.R. § 585.103(a)(1). Although departures must be "in writing," *id.* § 585.103(b)(4), Bureau regulations "impose no particular requirements for the form or disclosure" of departures.

---

[6] Of course, NEPA requires the Bureau to include these surveys in its environmental impact statement; but we need not vacate the construction plan on that basis. *See* pp. 9-10 *supra*.

13

Defendants Br. at 48. The regulations require only that "the supporting rationale" for the departure be "documented in writing by the [Bureau]." 74 Fed. Reg. 19,638, 19,717 (Apr. 29, 2009). The Bureau's letter meets this requirement by offering a rationale that is "consistent with the facilitation of 'appropriate activities on a lease.'" *Pub. Emps.*, 25 F. Supp. 3d at 106 (quoting 30 C.F.R. § 585.103(a)(1)).

## II

Plaintiffs next argue that Coast Guard and the Bureau violated the Maritime Transportation Act by failing to include adequate terms and conditions in Cape Wind's Renewable Energy Lease. *See* 120 Stat. 516, 540. Cape Wind's lease "authoriz[es] the use of [the Horseshoe Shoal]," 30 C.F.R. § 585.112, and specifies "terms, conditions, and stipulations" for the construction and operation of Cape Wind's renewable energy facilities there. *Id.* § 585.201; *see id.* § 585.200 *et seq.* ("Issuance of [Outer Continental Shelf] Renewable Energy Leases"). Before issuing a lease, the Bureau must consult with relevant federal agencies and "respond to findings of those agencies . . .." *Id.* § 585.203. One such agency is the Coast Guard, which has the authority and responsibility under § 414 of the Maritime Transportation Act to "specify the reasonable terms and conditions the [Coast Guard] determines to be necessary to provide for navigational safety with respect to the proposed lease" and to "each alternative to the proposed lease . . . considered by the [Bureau]." 120 Stat. 516, 540, § 414(a).[7] The Bureau must then incorporate the Coast Guard's

---

[7] Section 414 applies exclusively to "offshore wind energy facilit[ies] in Nantucket Sound," 120 Stat. 516, 540, and was "passed in large part" as a response to the Cape Wind Project, *Pub. Emps.*, 25 F. Supp. 3d at 95 (citing 152 CONG. REC. S6439 (daily ed. June 22, 2006) (statement of Senator Stevens)).

14

terms into any lease it issues. *See id.* § 414(b). Plaintiffs claim that the Coast Guard and the Bureau violated § 414 by including terms that do not sufficiently "ensure navigational safety," and by failing to include terms "for each alternative" to the proposed lease. Alliance Br. at 10, 19. We do not think either claim requires the Coast Guard to reissue its terms.[8]

The Coast Guard released its terms and conditions for the Cape Wind Project on August 2, 2007. The terms required Cape Wind to satisfy several immediate conditions, such as devising a turbine "marking scheme" to aid in navigation through the wind farm, some ongoing reporting obligations, like filing monthly "construction status" reports, and some future research requirements, including examining whether the turbines "would interfere in any way with marine communications or navigation systems . . .." According to the Coast Guard, its terms would sufficiently "provide for navigational safety" in Nantucket Sound.

Plaintiffs argue that the Coast Guard's terms requiring ongoing reporting and research violate § 414. They say that § 414 requires the Coast Guard to "assure navigational safety *before* the [p]roject is approved," and that these forward-looking terms mean that the Coast Guard will be able to do so "*only after* various analyses . . . are completed." Alliance Br. at 9, 11. The district court disagreed. It compared § 414's requirements to the licensing scheme in § 4(e) of the Federal Power Act, 16 U.S.C. § 797(e), which requires license conditions to be "reasonably related to [the agency's statutory] goal[s] . . .." *Pub. Emps.*, 25 F. Supp. 3d. at 97 (quoting *Escondido Mut. Water Co. v. La Jolla Band of Mission Indians*, 466 U.S. 765,

---

[8] Similarly, we do not think the Bureau violated the Maritime Transportation Act by incorporating the Coast Guard's terms into Cape Wind's lease.

778 (1984)); *see* 152 CONG. REC. at S6439 (explaining that § 414 "has preceden[t] in the procedure for granting hydroelectric licenses under the Federal Power Act"). The court reasoned that the forward-looking terms here were "reasonably related to the Coast Guard's goal to provide navigational safety" and therefore did not violate § 414. *Pub. Emps.*, 25 F. Supp. 3d at 97.

We agree with the court that the Coast Guard's terms comply with § 414, but for somewhat different reasons. Section 414 requires the Coast Guard to "specify the reasonable terms and conditions *the* [*Coast Guard*] *determines* to be necessary to provide for navigational safety" in Nantucket Sound. 120 Stat. 516, 540, § 414(a) (italics added). The Coast Guard stated that its terms met this requirement, and we are hesitant to second guess that determination "given the Coast Guard's expertise" in "maritime safety . . .." *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003). Section 414 also contemplates the possibility that the terms might have informational gaps that can be filled in later. After all, this section requires the Coast Guard to issue its terms at least "60 days before" the Bureau publishes its draft environmental impact statement. 120 Stat. 516, 540, § 414(a). In addition, § 414 applies only to projects covered by § 8(p) of the Shelf Lands Act, which requires "inspection, research, [and] monitoring" of renewable energy projects, 43 U.S.C. § 1337(p)(4)(L). The Coast Guard's research and reporting terms complement § 8(p) nicely. In short, the Coast Guard believed that its terms would provide for navigational safety, and the fact that some of those terms are forward-looking is not enough to disregard this expert judgment.

Plaintiffs also claim that the Coast Guard violated § 414 by failing to issue terms for the "alternative [project] sites under consideration." Alliance Br. at 19. They point to § 414's

requirement that the Coast Guard issue terms for "each alternative to the proposed lease," 120 Stat. 516, 540, § 414(a), and interpret this to mean that the Coast Guard must provide terms for each "NEPA alternative." *Pub. Emps.*, 25 F. Supp. 3d at 100. NEPA requires agencies to analyze all "reasonable" or "feasible" alternatives to proposed actions, which plaintiffs say includes alternative project locations. *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991); *see* 42 U.S.C. § 4332(2)(C). In contrast, the Coast Guard interprets § 414 "to require only the issuance of terms and conditions for alternative proposals" submitted by Cape Wind. *Pub. Emps.*, 25 F. Supp. 3d at 101.[9] The Coast Guard claims that plaintiffs' interpretation is "illogical" because the Coast Guard must issue terms before the Bureau publishes its draft impact statement, so the Coast Guard would have to issue terms for NEPA alternatives "before they [a]re even defined." Defendants Br. at 34.

We need not decide this question of interpretation because any error by the Coast Guard was harmless. While the Bureau was conducting research for its impact statement, it learned that the alternative sites were "not technically feasible," not "economically viable," or would have greater "[e]nvironmental impacts" than the Horseshoe Shoal site.[10] Therefore, the Coast

---

[9] On appeal, the Coast Guard also argued that its general terms "were relevant to any alternative that the [Bureau] might consider." Defendants Br. at 33. However, as plaintiffs point out, that position is "contradicted by the Coast Guard's prior position[]" that § 414 alternatives refer only to "sites proposed by [Cape Wind]." Alliance Reply Br. at 9, 9 n.4. Therefore, we will not consider this argument. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94-95 (1943).

[10] The Bureau found that two other sites would have had less impact "on visual resources" than the Horseshoe Shoal, but choosing those sites would still have caused greater harm to various environmental resources

Guard's failure to issue terms for alternative sites did not affect the Bureau's ultimate decision to choose the Horseshoe Shoal. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."). We do not see any point in requiring Cape Wind to go back now and issue "navigational safety" terms for otherwise inferior sites. 120 Stat. 516, 540, § 414*; see Pub. Emps.*, 25 F. Supp. 3d at 100-01 ("[I]t would be odd to require the Coast Guard to provide terms and conditions for each NEPA alternative, given that several alternatives were jettisoned without detailed consideration for various reasons.").

## III

Plaintiffs' final contention is that the Fish and Wildlife Service violated the Endangered Species Act. *See* 16 U.S.C. § 1538. Under the Act and its regulations, agencies must determine whether approved actions "may affect," 50 C.F.R. § 402.14(a), any "endangered [or threatened] species of . . . wildlife," and if so, must consult with the Service, 16 U.S.C. § 1538(a)(1). *See* 50 C.F.R. §§ 17.21, 402.14(a). The Service must then provide the agency with a written statement "explaining how the proposed action will affect th[ose] species" and recommending "reasonable and prudent" measures to minimize any harm. *Bennett v. Spear*, 520 U.S. 154, 158 (1997); *see* 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)-(i). The Service must include its recommendations in what is known as an "incidental take statement," 520 U.S. at 158, and must base them on the "best scientific and commercial data available," 50 C.F.R. § 402.14(g)(8). *See* 16 U.S.C. § 1536(a)(2), (c)(1). Plaintiffs argue that the Service's incidental take statement for the Cape Wind Project is arbitrary and capricious because it is

including "avifauna, subtidal resources, non-[endangered] mammals, fish and fisheries, [and] essential fish habitat[s]. . .."

not based on the best available scientific data, and because it excludes a particular mitigation measure.

The Bureau began consultations with the Service in November 2005 to determine whether the project could harm any endangered or threatened species. On October 31, 2008, the Service estimated that although Cape Wind's activities would not "jeopardize the continued existence" of any listed species, 50 C.F.R. § 402.14(g)(4), the turbines would nonetheless kill 80-100 endangered roseate terns and ten threatened piping plovers over the life of the project.[11]  *See id.* § 17.11(h) ("List of

---

[11] These are two species of migratory birds, and plaintiffs also argued that the Bureau violated the Migratory Bird Treaty Act by not requiring Cape Wind to obtain a Migratory Bird permit before harming these species. *See* 16 U.S.C. § 703(a).  The Ninth Circuit recently considered a similar issue in *Protect Our Cmtys. Found. v. Jewell*, No. 14-55666, 2016 WL 3165630 (9th Cir. June 7, 2016).  We need not address this claim because, unlike the situation recounted in the Ninth Circuit's decision, Cape Wind intends to get a permit before beginning construction.  At oral argument, the Bureau explained that the lease requires Cape Wind to comply with all federal laws and that the Bureau's "official position" is that Cape Wind is "obligated under federal law to get a [migratory bird] permit."  The Bureau concedes that failure to do so "will violate the lease."  Cape Wind agreed, stating "unequivocally that the lease requires that Cape Wind comply with all laws," and that because the Bureau concedes that "a [migratory bird] permit is required," Cape Wind "will apply" for one.

Although such permits are typically issued for actions intended to harm migratory birds, like hunting, the Service's "longstanding position" has been that the Act also applies to harm that "occurs incidental to, and which is not the purpose of, an otherwise lawful activity . . .."  80 Fed. Reg. 30,032, 30,034 (May 26, 2015).  The Service is currently considering new regulations to authorize incidental take. *Id.*  Cape Wind may be able to secure the necessary authorization through the new regulatory framework before beginning

Endangered and Threatened Wildlife"). The Service therefore issued a draft incidental take statement recommending measures to minimize harm to roseate terns and piping plovers in Nantucket Sound. One recommendation was to temporarily turn off the windmills during poor visibility periods to "reduce the risk of collision" by birds flying through the wind farm – a process ironically called "feathering" the turbines.[12] Cape Wind and the Bureau objected to this recommendation because they were concerned it would shut down the turbines for too long. The Service heeded these concerns. On November 21, 2008, it published a final version of its incidental take statement that did not recommend feathering. The Service explained that it had excluded the measure because the Bureau and Cape Wind had "determined" that feathering would "modif[y] the scope of the project in a manner that is adverse to the project's stated purpose and need," "have a deleterious [e]ffect on anticipated revenues, financing, and power purchasing agreements," and ultimately have a steep enough "economic cost" to make the measure "not feasible."

---

construction, which is currently suspended until July 24, 2017. If not, Cape Wind may still be eligible to apply for a permit under 50 C.F.R. § 21.27, which authorizes "special purpose permit[s]" for activities "outside the scope of the standard form permits . . .." Either way, we take the defendants at their word that the lease requires a migratory bird permit and that Cape Wind will apply for one.

[12] "Feathering" involves shutting the turbines down and turning the blades "into the wind to present a narrower face for collision." In its draft statement, the Service recommended feathering twice per year for about three-to-four weeks at a time, and only when "climatic factors reduce visibility at turbine height . . .." These periods were calculated to coincide with the migration, commuting, and foraging times of piping plovers and roseate terns. The Service stated that "feathering is the only operational change" that would "actually reduce the level of [incidental take]" of these birds.

In June 2010, Plaintiffs challenged the incidental take statement on the grounds that the Service had "improperly delegat[ed] to Cape Wind and to the [Bureau]" its duty to independently evaluate and recommend mitigation measures. *Pub. Emps.*, 25 F. Supp. 3d at 107. The district court initially agreed, explaining that the Endangered Species Act requires the Service to "make an independent determination" whether feathering "was a reasonable and prudent measure . . .." *Id.* at 130. The court therefore remanded the case on March 14, 2014, for the Service to "make the required independent determination on this point." *Id.*

On remand, plaintiffs submitted scientific and economic data to the Service that argued feathering "would have, at most, a minuscule economic impact on the project," and that the government has previously required other wind projects to "make comparable operational adjustments to minimize [harm to] protected species." PEER Br. at 17-18. The Service ignored these submissions. In July 2014, the Service filed a letter with the district court claiming that it had complied with the remand order and had made an "independent evaluation of the initially proposed feathering [measure] . . .." The Service explained that after consulting with its "in-house economist," it had "conclude[d] that the draft feathering [measure] should not be included" in the incidental take statement. The letter added that "[b]ecause the [c]ourt did not vacate the [incidental take statement]" or order "the reopening of the administrative record," the Service had limited its determination to "the information available" at the time the statement was issued in 2008. Therefore, according to the Service, it did not need to consider plaintiffs' 2014 submissions.

Plaintiffs argued that because the Service considered its economist's 2014 analysis, the Service was required to considered plaintiffs' submissions as well. Plaintiffs also

challenged the merits of the Service's decision to exclude feathering. In November 2014, the district court dismissed these challenges on the grounds that they were either "waived or were already dismissed by the [c]ourt." Although the court's March 2014 order required the Service to "*make* the required independent determination," *Pub. Emps.*, 25 F. Supp. 3d at 130 (italics added), in November the court interpreted its order to require only that the Service "*clarify*[] that it *made* an independent determination in 2008 . . .." Joint Appendix at 777-78 (italics added). Therefore, according to the court, the Service was not "required to consider the materials that the plaintiffs sought to have included in the record." The court also found that because plaintiffs "challenge[d] *only* whether the determination itself was *independently* made by the [Service] and not the bases of [that] determination," they had waived their right to challenge the merits of the incidental take statement.

Plaintiffs may be correct that the district court's remand order required the Service to "make" a new independent determination, and therefore reopened the record. PEER Br. at 26. On the other hand, the Service may be correct that the court's remand order required the Service to only "clarify" that it made an independent determination in 2008. Defendants Br. at 61; *see AT&T Wireless Servs., Inc. v. FCC*, 365 F.3d 1095, 1099 (D.C. Cir. 2004) ("The court is generally the authoritative interpreter of its own remand . . .."). We need not decide who is right. Even if the district court's order did not reopen the administrative record, the Service did so on its own. The Service decided to exclude feathering based on "[t]he expert opinion of [its] in-house economist," which he communicated to the Service on May 28, 2014. That he reviewed information available in 2008 is beside the point. He analyzed the information in 2014. He did so "in response" to the court's 2014 remand order. The Service concedes that his opinion "reflected an *additional* analysis of the decision" to exclude

feathering, Defendants Br. at 63, and that the Service then relied upon this opinion "[i]n particular" to "find that the draft feathering [measure] would not be reasonable." By doing so, the Service reopened the record and was required to consider plaintiffs' submissions.

We therefore hold that the Service's decision to disregard plaintiffs' submissions was arbitrary and capricious, and we vacate the incidental take statement. Because we vacate the statement, we need not decide whether the district court erred by denying plaintiffs the opportunity to challenge its merits.

IV

We reverse the district court's judgment that the Bureau's environmental impact statement complied with NEPA and that the Service's incidental take statement complied with the Endangered Species Act, and we vacate both statements. *See* 5 U.S.C. § 706(2). We affirm the district court's judgment dismissing plaintiffs' remaining claims, and remand the case for proceedings consistent with this opinion.

*So ordered.*