# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 10, 2017        Decided January 19, 2018

No. 16-1298

NATURAL RESOURCES DEFENSE COUNCIL AND POWDER RIVER
BASIN RESOURCE COUNCIL,
PETITIONERS

v.

U.S. NUCLEAR REGULATORY COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

STRATA ENERGY, INC.,
INTERVENOR

On Petition for Review of an Order of the
United States Nuclear Regulatory Commission

*Shannon Anderson* argued the cause for petitioners. On the brief were *Howard M. Crystal* and *Geoffrey H. Fettus*.

*Eric V. Michel*, Attorney, U.S. Nuclear Regulatory Commission, argued the cause for federal respondents. With him on the brief were *John C. Cruden*, Assistant Attorney General at the time the brief was filed, U.S. Department of Justice, *Lane N. McFadden*, Attorney, and *Andrew P. Averbach*, Solicitor, U.S. Nuclear Regulatory Commission.

*Christopher S. Pugsley* argued the cause for intervenor-respondent. With him on the brief was *Anthony J. Thompson*.

*David A. Repka*, *Tyson R. Smith*, *Ellen C. Ginsberg*, and *Jonathan M. Rund* were on the brief for *amicus curiae* Nuclear Energy Institute, Inc. in support of respondents.

Before: KAVANAUGH, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: The Nuclear Regulatory Commission issued a license to Strata Energy, Inc. to mine uranium in Crook County, Wyoming. The Natural Resources Defense Council, Inc., and the Powder River Basin Resource Council (collectively, the Councils) intervened in the licensing proceeding and now petition this court for review, alleging both procedural and substantive defects in the licensing process. For the reasons that follow, we deny their petition.

## I.   Background

We begin with a brief explanation of the mining process, insofar as relevant to this litigation, before describing the facts and procedural background of this case.

### A. ISL Mining

In situ leach uranium mining (ISL mining) involves the extraction of uranium from permeable uranium-bearing sandstone. The extraction begins with the drilling of an injection well into the sandstone formation, through which is pumped the "lixiviant," a liquid that separates the uranium

from the permeable sandstone. The uranium-permeated lixiviant is pumped out through a recovery well and processed to extract the uranium. A uranium mining project may comprise hundreds or even thousands of such wells, grouped together in a "wellfield."

Although the layer of sandstone from which the uranium is extracted is meant to be hydrologically isolated — that is, bounded by layers of impermeable rock — "excursions" of the lixiviant may occur. In order to reduce the risk of excursions, ISL mining projects use "monitoring wells," which miners drill both around the perimeter of a wellfield and into overlying and underlying aquifers in order to monitor any changes in the chemical composition of the water.

**B. Background**

Strata sought a license from the Commission to mine uranium at what it calls the Ross Project in Crook County, Wyoming. 76 Fed. Reg. 41,308, 41,309 (2011). The Ross Project lies in an area known as the Lance District, which spans parts of Nebraska, South Dakota, and Wyoming.

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*., and the Atomic Energy Act (AEA), 42 U.S.C. § 2011 *et seq.*, along with the Commission's regulations implementing them, governed the licensing process. That process begins when a mining company files an "application for a license to possess and use source material for uranium milling." 10 C.F.R. § 40.31(f). The application must include, among other things, a discussion of "the impact of the proposed action on the environment;" "[a]ny adverse environmental effects which cannot be avoided should the proposal be implemented;" and "[a]lternatives to the proposed action." *Id.* § 51.45(b)(1)-(3).

**1. The AEA**

Under the AEA, 42 U.S.C. § 2011 *et seq.*, anyone "whose interest may be affected by the [licensing] proceeding" has a right to intervene and be heard. *Id.* § 2239(a)(1)(A). To get a hearing, an intervenor must specify at least one "contention" "[p]rovid[ing] a specific statement of the issue of law or fact to be raised or controverted … directed at demonstrating that one or more of the acceptance criteria [for a license] have not been, or will not be met." 10 C.F.R. § 2.309(f).

The Councils, which intervened on behalf of a member living in Wyoming, sought and were granted a hearing. *See In re Strata Energy, Inc. (Ross In Situ Recovery Uranium Project)* (*Strata I*), 75 N.R.C. 164 (2012). Initially, the Commission admitted the Councils' Contentions Nos. 1, 2, 3, and 4/5A, with Contention No. 1 being of limited relevance to this appeal. Contention No. 2 relates to the Commission requirement that, upon the completion of mining operations, the miner restore a mined aquifer so the groundwater concentration of the previously mined hazardous element or mineral does not exceed a specified limit. 10 C.F.R. Part 40, App. A. Of the three options for restoration, the one relevant here is restoration to an "alternate concentration limit [ACL] established by the Commission," *id.* Criterion 5B(5)(c), with this ACL being "as low as reasonably achievable" so remaining hazardous chemicals or minerals in the groundwater "will not pose a substantial present or potential hazard to human health or the environment," *id.* Criterion 5B(6). Contention No. 2 charged Strata with "fail[ing] to analyze the environmental impacts that will occur if [Strata] cannot restore groundwater to primary or secondary limits" — that is, if Strata were forced to restore groundwater to an ACL. *Strata I* at 212.

Contention No. 3 dealt with the risk of excursions; it claimed Strata had "fail[ed] to include adequate hydrological information to demonstrate [its] ability to contain groundwater fluid migration." *Id.* Finally, Contention No. 4/5A asserted that Strata had further expansion plans for the Lance District but had "fail[ed] to adequately assess cumulative impacts of the proposed action and the planned Lance District expansion project." *Id.*

Once the Commission receives a license application, the Commission staff prepares a draft environmental impact statement (EIS), which analyzes the environmental effect of the proposal and of any alternatives. *See* 10 C.F.R. §§ 51.70-71. The Commission can "migrate" contentions made against an initial license application (that is, "deem[] [them] to apply") to the draft EIS or final EIS (FEIS) if "the information in the [draft EIS or FEIS] is sufficiently similar to the material in the [license application]" that the contention remains relevant. *In re Strata Energy, Inc. (Ross In Situ Recovery Uranium Project)* (*Strata IV*), 83 N.R.C. 566, 570 n.17 (2016) (internal quotation marks omitted).

After the staff completed its draft EIS, the Atomic Safety and Licensing Board that conducted the hearing occasioned by the Councils' intervention permitted the Council to migrate Contentions Nos. 1, 2, and 3 to the draft EIS. It disallowed Contention No. 4/5A on the ground that "the substantive basis of the cumulative impacts analysis asserted to be inadequate in the [license application] differs significantly from that provided in the [draft EIS]." *In re Strata Energy, Inc. (Ross In Situ Recovery Uranium Project)* (*Strata II*), LBP-13-10, 2013 WL 8433972, at *21 (N.R.C. July 26, 2013). The Board noted that, if a contention is not obviously going to be migrated, then its proponent should either seek to amend it or have it treated as a new contention pursuant to 10 C.F.R. § 2.309(c)(1) and

(f)(1), failing which the contention may be lost. *Id.* at \*22 n.15. The Board also declined to admit a new Contention No. 6. *Id.* at \*22-29.

A draft EIS is subject to public comment. 10 C.F.R. § 51.73. Per Commission regulations, once comments have been received and addressed, the staff publishes its FEIS, *id.* § 51.91(a)(1), a record of decision, *id.* § 51.102, and a decision on whether to issue a license, *id.* § 2.1202(a). The staff published the FEIS for the Ross Project in March 2014. 79 Fed. Reg. 13,683 (March 11, 2014). Shortly thereafter, it issued a record of decision, rejected all the Councils' remaining contentions, and granted Strata a license.

**2. The NEPA**

In order to ensure that agencies consider the environmental consequences of their actions, the NEPA requires them to "include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement … on … the environmental impact of the proposed action." 42 U.S.C. § 4332(C)(i). This requirement is meant both to guarantee an agency will "consider every significant aspect of the environmental impact of a proposed action" and "inform the public" that it has done so, *Baltimore Gas & Electric Co. v. NRDC, Inc.*, 462 U.S. 87, 97 (1983) (internal quotation marks omitted), and to "focus[] the agency's attention on the environmental consequences of a proposed project … [so] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

Here the parties agree the relevant report for NEPA purposes is the FEIS, but the evidentiary hearing to which the Councils were entitled under the AEA took place some six months after the FEIS and the license had been issued. *See* 79 Fed. Reg. 44,471 (July 31, 2014). This was in keeping with Commission regulations, as "the NRC staff is expected to promptly issue its approval or denial of [a license] application," even "[d]uring the pendency of any hearing." 10 C.F.R. § 2.1202(a).

In January 2015, the Board issued a decision on the Councils' remaining contentions. *In re Strata Energy, Inc. (Ross In Situ Recovery Uranium Project)* (*Strata III*), 81 N.R.C. 65 (2015). It rejected all their contentions and found no fault with the decision to issue the license. It did, however, find one fault with the FEIS itself — namely, that it did not include enough information concerning post-mining aquifer restoration to an ACL at ISL mining sites other than the Ross Project. *Id.* at ¶¶ 4.87-4.89 & n.49. The Board, however, rejected the Councils' argument that it should invalidate the license on the ground that the FEIS was inadequate at the time the license was issued. Instead, the Board decided staff testimony in the record before it dealing with restoration to an ACL at other sites served to "supplement[]" the FEIS, thus making it adequate to support issuance of the license. *Id.* at ¶ 4.89.

Strata sought review by the Commission of the Board's decisions supplementing the FEIS, refusing to migrate Contention No. 4/5A, and rejecting Contention No. 6; it also raised various substantive objections to the license. The Commission rejected all Strata's arguments, with one Commissioner dissenting in part on the ground that supplementation of the FEIS meant the license was issued before the FEIS was complete, in violation of the NEPA.

*Strata IV*, 83 N.R.C. 566. The Councils here raise essentially the same arguments they made to the Commission that its actions violated the NEPA and were arbitrary and capricious in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A).

## II.   Analysis

The APA, of course, requires this court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Upon review of the EIS, our job is to ensure that the agency took a 'hard look' at the environmental consequences of its decision to go forward with the project." *City of Grapevine, Tex. v. Dep't of Transp.*, 17 F.3d 1502, 1503-04 (D.C. Cir. 1994). "In doing so, we are mindful that our role is not to 'flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor.'" *WildEarth Guardians v. Jewell*, 738 F.3d 298, 319 (D.C. Cir. 2013) (quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006)).

## A. Failure to Migrate Contention No. 4/5A and to Admit Contention No. 6

The Councils complain first that the Board refused to migrate Contention No. 4/5A from the license application to the draft EIS and that it refused to allow their new Contention No. 6.

### 1. Contention No. 4/5A

The Board will permit the migration of a contention if the analysis at which it is directed is substantially the same in the license application and in the draft EIS. That was not the case

here; the discussion of possible cumulative effects associated with the Ross Project was substantially more thorough in the draft EIS than in the license application. *Strata II*, 2013 WL 8433972 at \*21-22 and n.15. The Board also declined to amend the Contention *sua sponte* to apply to the discussion in the draft EIS; amended contentions must satisfy the "good cause" factors set out in 10 C.F.R. § 2.309(c)(1), and the Councils failed even to imply they wanted to amend Contention No. 4/5A and failed to mention those factors in their application to migrate the Contention. *Id.*

The Councils charge the Board's refusal to migrate Contention No. 4/5A elevated form over substance: Information showing they did have good cause and that the basis for Contention No. 4/5A did not differ substantially between the license application and the draft EIS was available in the record, and the Board should have found it even if the Councils themselves did not specifically point to it. But a court is not required to plumb the record for "novel arguments a [litigant] could have made but did not," *United States v. Laureys*, 653 F.3d 27, 32 (D.C. Cir. 2011); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"), and we see no reason agency officials engaged in adjudication should be any more obligated than judges to do counsels' work for them. We are unwilling, therefore, to fault the Board for failing to hunt for such evidence when the Councils themselves did not even imply they wanted to amend their Contention.

### 2. Contention No. 6

The Councils' proposed Contention No. 6 challenged the failure of the draft EIS to consider the environmental consequences of mining the entire Lance District, as opposed to just the Ross Project. *Strata II*, 2013 WL 8433972 at \*23.

The Commission's own regulations require that various projects be considered in a single EIS if they are "connected," "cumulative," or "similar." 40 C.F.R. § 1508.25(a). A contention that a set of projects is connected, cumulative, or similar must, however, like any other contention, be made in a timely manner, as specified in 10 C.F.R. § 2.309(c)(1)(iii); here the Board held any argument that Ross Project was cumulative with or similar to other projects was not timely because the information necessary for making that argument was available in various press releases from Strata and its parent company well before the Councils attempted to file Contention No. 6. *Strata II*, 2013 WL 8433972 at \*28.

The Councils do not challenge that decision. They do, however, challenge the Board's conclusion that the Ross Project and future Lance District projects were not "connected" within the meaning of § 1508.25(a), though they do so in vague terms.

Section 1508.25(a)(1)(iii) defines "connected" projects as projects that "[a]re interdependent parts of a larger action and depend on the larger action for their justification." The Board concluded the Ross Project was not dependent upon any future project because the Ross Project had "independent utility" — meaning the Ross Project was viable even if no other part of the Lance District were to be developed. *Strata II* at \*26-27 (citing *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985)). Beyond a vague allusion to "other evidence," all the Councils offer this court to show the Ross Project lacked independent utility is that it "was intended to service the larger Lance District operation" and "Strata's parent company had publicly announced the larger development plans." This simply does not respond to the Board's finding that the Ross Project was economically viable standing alone. That its sponsor envisioned it as part of a larger uranium production complex

does not mean the Ross Project would not have been built absent the larger production complex that Strata hoped eventually to develop.

## B. Supplementation of the EIS Post-Licensure

The Councils' other procedural complaint focuses upon the supplementation of the FEIS after the staff had issued a license to Strata. As stated above, when the staff issued the license the Board had found only one flaw with the FEIS and the Record of Decision, namely, that the FEIS did not contain enough information on other aquifers previously restored to ACLs after the completion of an ISL mining project. *Strata III*, 81 N.R.C. at ¶¶ 4.87-4.89 & n.49. Nevertheless, the Board held "the post-restoration uranium concentration levels reported in the Staff's prefiled [hearing] testimony supplements the [FEIS] so as to cure any defect in that regard." *Id.* at ¶ 4.89.

When the Councils challenged this supplementation on appeal, the Commission denied review because "the Board evaluated the Staff's analysis and determined that, with the additional information considered at the hearing and in the Staff's prefiled testimony, the environmental impacts of the proposed licensing action were appropriately identified." *Strata IV*, 83 N.R.C. at 594. In addition, the Commission noted it had "previously held that a Board's hearing, hearing record, and subsequent decision on a contested environmental matter augment the environmental record of decision developed by the Staff with respect to this issue." *Id.* at 595 (citing *In re Entergy Nuclear Ops., Inc. (Indian Point, Units 2 and 3)*, 81 N.R.C. 340, 388 (2015)).

Commissioner Baran, dissenting, concluded that "the adjudicatory decision or proceedings cannot supplement the NEPA environmental document or Record of Decision after the

fact because the licensing action has already been taken in reliance on the NEPA analysis." *Id.* at 604. "[O]nly with the additional information considered at the hearing, were the environmental impacts of the proposed licensing action appropriately identified." *Id.* Therefore, the NEPA analysis itself was inadequate to justify the decision made. *Id.*

In its petition for review by this court, the Councils renew their arguments, and adopt the point Commissioner Baran made in his dissent. In short, their argument is that the purpose of the NEPA is to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken," 40 C.F.R. § 1500.1(b), and the Board as much as admitted the FEIS failed in that regard. Relatedly, the Councils cite *Robertson* for the proposition that the NEPA is an information-forcing statute, intended to require agencies to have all the relevant information before "resources have been committed or the die otherwise cast." 490 U.S. at 349.

These are not idle concerns. We must consider, however, the exact nature of the initial decision to issue the license. The Commission seeks to portray the initial licensing decision as entirely provisional; that is not quite correct for, as the Councils charge (and the Commission does not deny), Strata was authorized to begin digging immediately upon receipt of the license. At the same time, the license was provisional in the most meaningful sense; no portion of it was irrevocable, and the Commission's own regulations make clear that the Board can amend or rescind a license after it has been issued. 10 C.F.R. § 2.340(e)(2). Indeed, the Board did amend the license to increase the area in which Strata was required to attempt to locate and to fill previously dug boreholes. *See Strata III* at ¶ 4.131.

Moreover, the Councils have not pointed to any harmful consequence of the supplementation; the Board came to the same decision after it had considered the supplemental information, and there is nothing to be gained by remanding the matter to the Commission for the staff or the Board to consider the same information again.

Indeed, as the Commission points out, we encountered this same situation in *Friends of the River (FOTR) v. FERC*, 720 F.2d 93 (D.C. Cir. 1983). The project at issue there was a hydroelectric dam; intervenors had challenged the plan to build the dam, arguing that the power need could be met by purchasing power produced by existing facilities. 720 F.2d at 95-97. The FEIS had "accorded only summary attention to [that] concern." *Id.* at 97. The FERC issued the license for the dam, and only when it denied the intervenors' petition for rehearing did it provide a "cogent[]" explanation of "why [it] rejected prospects for further reliance on purchased power as a ground for refusing the license." *Id.*

Despite this post-license supplementation of the record of decision, we upheld the FERC's determination, rejecting essentially the same points the Councils raise here. We noted that the NEPA "establishes an essentially procedural requirement" that agencies "present evidence and discussion relevant to their environmental decisionmaking in one comprehensive document — the [EIS]." *Id.* at 105-06 (internal quotation marks omitted). We held the FERC failed to "measure up to NEPA's command." *Id.* at 106.

Nevertheless, we did not remand the matter for reconsideration because that would have been futile. Had we done so, the agency would have been required to investigate the possibility of purchasing power from alternative sources, but "well before the start of [our] review … the [FERC] *did*

make such an investigation" and "incorporated its findings in an opinion accessible to the public." *Id.* *Public Employees for Environmental Responsibility v. Hopper*, 827 F.3d 1077 (D.C. Cir. 2016), upon which the Councils rely, is quite different. There the Bureau of Ocean Energy Management did not adequately consider the seafloor surrounding a wind energy project because it never undertook seafloor surveys. *Id.* at 1082-84. The intervenor, Cape Wind, the proponent of the project at issue, acknowledged the FEIS required those surveys but said they had in fact been done. *Id.* at 1083. The surveys were never acknowledged in agency decisions, however, and were never made available to the public; hence, the agency had not adopted them in any meaningful way, and a remand was in order. *Id.* This is unlike the situation here, where the agency recognized the inadequacy in the record of decision and corrected it before being challenged in court.

This case is on all fours with *FOTR,* not *Hopper*. Here, the Commission had adequately augmented its decision before being challenged in this court, and did so in a publicly accessible opinion. As in *FOTR*, "[w]e are not left to rely on *post hoc* rationalizations … [because] we have before us [the Commission's] assessment, embodied in an opinion composed after due investigation and before the matter was brought to court." 720 F.2d at 106-07. Moreover:

> Sending [this decision] back "to teach the agency a lesson" would be an essentially punitive measure; we can discern no benefit to the public in such a course, and no genuine service to the policies NEPA advances…. Remands in such cases would inevitably breed cynicism about court commands; they would likely yield going-through-the-motions responses on the part of those told to attend to the court's costly, resource-consuming instruction to redo, under the

proper heading, what has already been done effectively.

*Id.* at 107-08.

The Councils offer two grounds for distinguishing *FOTR*, but neither is convincing. The first is that in *FOTR* the license was issued only after the FEIS had been made adequate. This is incorrect; in *FOTR* the license was issued in February 1982 but the FERC adequately confronted the alternative of purchasing power for the first time some months later, in denying rehearing of the initial decision to grant the license. *Id.* at 97.

The second ground, raised for the first time at oral argument, is that *FOTR* dealt with consideration of potential alternatives to a given project, whereas this case deals with the potential environmental effects of the project itself. This belated assertion is true but irrelevant, for the two requirements stand on the same footing. The NEPA requires that an EIS or other similar report include a statement both of "any adverse environmental effects which cannot be avoided should the proposal be implemented" and of "alternatives to the proposed action." 42 U.S.C. § 4332(C)(ii)-(iii). So too do the Commission's own regulations. 10 C.F.R. § 51.45(b)(2), (3). If the FEIS is required in one breath to consider both the environmental effects of a proposed project and potential alternatives to that project, then we cannot say the failure of one FEIS adequately to consider a potential alternative is somehow less important than the failure of another adequately to consider a potential effect of the proposed project.

We do not mean to imply the procedure the Board followed was ideal or even desirable. Certainly it would be preferable for the FEIS to contain all relevant information and

the record of decision to be complete and adequate before the license is issued. *FOTR*, however, makes clear that even if this procedure was not ideal it was permissible, and common sense counsels against prolonging this dispute by requiring an utterly pointless proceeding on remand.

## C. Potential Negative Effect on the Mined Aquifer (Contention No. 2)

The first of the Councils' substantive claims is that the Board erred in rejecting Contention No. 2, viz., that Strata "fail[ed] to analyze the environmental impacts that will occur if [it] cannot restore groundwater to primary or secondary limits." *Strata I*, 75 N.R.C. at 212. In the Councils' view, Strata will inevitably restore groundwater in the mined aquifer to an ACL, and the FEIS failed adequately to analyze the potential environmental effects of restoration to an ACL. Though the Councils' brief is not entirely clear on this issue, we discern two main complaints: (i) the FEIS did not have enough evidence regarding restoration to an ACL at other sites and (ii) in making its determination the staff relied solely upon the mined aquifer never being used for drinking water.

We have already held it was acceptable for the Board to augment the FEIS with additional information regarding the restoration of other sites to an ACL. The Councils do not challenge the Board's determination that the information contained in the FEIS, once supplemented with the staff's prefiled hearing testimony, was a sufficient discussion of previous restorations to an ACL. Their first complaint is therefore moot.

The Councils' second complaint also fails. The aquifer at issue is "exempted" from being a source of drinking water — meaning "[i]t does not currently serve as a source of drinking

water" and "[i]t cannot now and will not in the future serve as a source of drinking water because … [i]t is mineral, hydrocarbon or geothermal energy producing." 40 C.F.R. § 146.4(a)-(b)(1). In the Councils' view, the Board simply concluded that the effect of the mining project upon the aquifer would be "small" because the effect of any mining project upon any exempted aquifer would be "small," and saying no more violated the requirement in the NEPA to disclose all adverse environmental effects of a major federal action.

In accordance with the NRC's usual practice, *see* ENVIRONMENTAL REVIEW GUIDANCE FOR LICENSING ACTIONS ASSOCIATED WITH NMSS PROGRAMS § 4.2.5.3 (2003) (NUREG-1748), the FEIS defines "small" effects as effects that are "not detectable … or so minor that they will neither destabilize nor noticeably alter any important attribute of the resource considered." "Large" effects, by contrast, "are clearly noticeable and are sufficient to destabilize important attributes of the resource considered." The definition of "medium" effects is not important, for these definitions reveal the Councils' mischaracterization of the Board's decision: The Board did not conclude that any effect upon an exempted aquifer would be "small"; rather, it found "there ha[d] been no showing that the impacts from employing an ACL will be 'clearly noticeable' and 'sufficient to destabilize important attributes of [the resource].'" *Strata III*, 81 N.R.C. at ¶ 4.107 (quoting the FEIS). That is, the Board concluded the effect would not be large, not that the effect would be small. This conclusion is unavoidable: Because it is "exempt," the only resource the aquifer has to offer is the uranium that can be mined from it, and we cannot see how actually mining the uranium would destabilize an important attribute of the aquifer.

In any event, the exempt status of the aquifer was not the only basis for the Board's conclusion. The Board also noted

"there have been no reported instances of an excursion from an [ISL mining] facility negatively impacting drinking water." *Id.* It further stated that if Strata were to seek to restore the aquifer to an ACL, "a license amendment would be required, triggering another NEPA review, and a hearing opportunity, which will involve the analysis of more specific water quality data." *Id.* Finally, it pointed out that the license itself included conditions designed to prevent precisely the kind of environmental damage the Councils fear. *Id.* In sum, the record belies the Councils' suggestion that the staff and the Board relied solely upon the exempted status of the aquifer.

**D. Incorrect Evaluation of the Risks of Off-Site Groundwater Contamination (Contention No. 3)**

Finally, the Councils petition for review of the Commission's treatment of Contention No. 3. The Ross Project site is replete with improperly filled boreholes from previous exploratory digs; the Councils' concern is that the presence of these unfilled boreholes presents an increased risk of excursions.

**1. Circular reasoning**

The Councils' initial criticism of the Commission concerning Contention No. 3 is that it left undisturbed the Board's circular reasoning. Specifically, the Councils point to a footnote in the Board's order saying that the staff "has an additional incentive … [to] ensure that [Strata's] … 'attempt' to locate and [properly] abandon all [unfilled boreholes] … embodies a level of effort that maximizes the potential for eliminating excursions" because the staff will want "to fully support its predicative finding of SMALL long-term impacts from fluid migration." *Strata III*, 81 N.R.C. at ¶ 4.128 n.66. In other words, the staff will ensure that the long-term effects of

excursions are small because it will want to vindicate its characterization in the FEIS of long-term effects as small. The Councils claim this reasoning is circular and violates the NEPA, which requires that the FEIS to be a forward-looking, predictive document, as opposed to a goal the agency staff have an incentive to achieve.

The Board's reasoning here is indeed somewhat circular, but it is of minor importance to the Board's decision. Its reference in the margin to the staff's desire to live up to the FEIS as an "additional incentive" implies there are other, no doubt more important, incentives at work. Indeed, the Board focused primarily upon the terms of the license itself, which required Strata to attempt to locate and to fill all boreholes in the area, to undertake additional tests before beginning production to prevent excursions, and to stop work immediately upon detection of an excursion. *Id.* at ¶ 4.128. It is only reasonable for the Board to rely upon the conditions in the license to determine the likely environmental effects of issuing the license, at least when the licensee — like Strata — does not have a record of failing to comply with license conditions. In analogous situations, we have permitted other agencies to rely upon the actions they have required in mitigation when predicting effects in an environmental analysis under the NEPA. *See Theodore Roosevelt Conservation P'ship v. Salazar,* 616 F.3d 497, 515-17 (D.C. Cir. 2010) (rejecting the argument that taking into account adaptive mitigation measures when measuring environmental effects violated the NEPA); *see also Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011) (noting that "we have found" "mitigation measures" can reduce the environmental effects of a major federal action).

The Councils also accuse the Commission of ignoring contrary data it was provided in expert reports by Drs. Lance

Larson and Richard Abitz, which they claim show that other companies with similar license conditions left boreholes unfilled. We confess to being puzzled by this accusation, as the Board specifically acknowledged this contrary evidence. *See Strata III*, 81 N.R.C. at ¶ 4.124 (acknowledging both experts' testimony). The Board simply came to a contrary conclusion on a technical subject as to which we owe the Commission some deference. *Chritton v. NTSB*, 888 F.2d 854, 856 (D.C. Cir. 1989).[*]

### 2. Inconsistent treatment of similar data

The Councils' second claim with regard to Contention No. 3 is that the Board, in its analysis of Contention No. 1, was willing to accept that various well samples could be averaged to produce baseline water quality data, *see Strata III*, 81 N.R.C. at ¶¶ 4.32-4.34, whereas when it came to the data the Councils presented in support of Contention No. 3, the Board was unwilling to accept a similar averaging. Of course, it would be arbitrary and capricious for the agency's decision making to be "internally inconsistent." *Air Transp. Ass'n of Am. v. Dep't of Transp.*, 119 F.3d 38, 43 (D.C. Cir. 1997). In this case, however, there was no inconsistency.

The Councils misunderstand the Board's reasoning. The Board rejected Dr. Abitz's testimony not because he averaged various samples to decide whether two aquifers were mixing; instead, the Board objected to his choice of a control. Specifically, Abitz proposed that test well 14-18OZ be "taken

---

[*] The Councils argue their real concern is with the terms of the license itself — namely, that it requires Strata only to "attempt" to locate and to fill the boreholes, instead of simply requiring Strata to do so. We do not consider this argument because it was first raised in the reply brief and hence is forfeit. *See Great Lakes Chem. Corp. v. NLRB*, 967 F.2d 624, 630 (D.C. Cir. 1992).

as [indicative of] the unmixed groundwater from the ore horizon." The Board deemed this proposal speculative because Abitz provided no evidence to support it. *Strata III*, 81 N.R.C. at ¶ 4.141. Based upon staff testimony, the Board instead concluded that well 14-18OZ was likely to be unrepresentative of unmixed groundwater and therefore a poor choice for a baseline. *Id.* Obviously, there is no inconsistency in accepting the average from a number of wells in one test while rejecting the choice of a particular well as the control or baseline for another.

### III.    Conclusion

The procedure followed by the Commission in this matter was not ideal, but there was no harm and no foul under either the NEPA or the APA, and hence there is no point in remanding the matter on that score. Nor have the Councils identified any substantive flaws in the Commission's decisions. The Councils' petition for review is therefore

*Denied.*