# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 13, 2025        Decided September 23, 2025

No. 24-1088

WORLD SHIPPING COUNCIL,
PETITIONER

v.

FEDERAL MARITIME COMMISSION AND UNITED STATES OF
AMERICA,
RESPONDENTS

---

On Petition for Review of an Order
of the Federal Maritime Commission

---

*Paul W. Hughes* argued the cause for petitioner. With him on the briefs were *Andrew Lyons-Berg* and *Grace Wallack*.

*Harry J. Summers*, Attorney-Advisor, Federal Maritime Commission, argued the cause for respondents. With him on the brief was *Phillip "Chris" Hughey*, General Counsel. *Tamar Anolic* and *Courtney E. Mallon*, Attorneys, entered appearances.

*Richard Pianka* was on the brief for *amici curiae* American Trucking Associations, Inc., et al. in support of respondents.

Before: SRINIVASAN, *Chief Judge*, WILKINS and CHILDS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:   The world's shipping lanes have become increasingly congested.  The rise in congestion has led to a dramatic increase in charges called "demurrage and detention" fees, through which upstream entities like ocean carriers penalize shippers, truckers, and others for delays in the delivery system.

In 2024, the Federal Maritime Commission issued a rule aimed at addressing growing concerns about demurrage and detention charges, including by limiting the parties against whom the fees may be assessed.  We now set aside that aspect of the rule as arbitrary and capricious.   While the Commission's basic, stated rationale was to confine the parties against whom demurrage and detention charges may be levied to entities who are in a contractual relationship with the billing party, the Commission, without adequate explanation, left out entities who are in such a contractual relationship while seemingly including others who are not.  We thus set aside that part of the Commission's rule while leaving in place the rest.

I.

A.

The maritime shipping of goods involves a web of entities and agreements.  At a high level, a "shipper" is the owner of the transported cargo.  *See* 46 U.S.C. § 40102(23).  A shipper ordinarily contracts with an ocean carrier—known as a "vessel-operating common carrier" (VOCC)—for shipment of the cargo in containers on board a container vessel.   *See*

Demurrage and Detention Billing Requirements (Final Rule), 89 Fed. Reg. 14330, 14330–31 (Feb. 26, 2024). When the ship arrives at the relevant port, the port operator—known as a "marine terminal operator" (MTO)—coordinates unloading and transfer of containers to a motor carrier (ordinarily a trucking company). *See* 46 U.S.C. § 40102(15). The motor carrier then transports a container over land either to the shipper or directly to the "consignee," who is the "ultimate recipient of the cargo." Final Rule, 89 Fed. Reg. at 14362. Once the cargo is unloaded from the container at its destination, the empty container must be returned to a carrier for use in another shipment.

In most cases, a shipper contracts directly with an ocean carrier for shipment of the cargo. That contract is typically called a "bill of lading," which "records that a carrier has received goods from the party that wishes to ship them, states the terms of carriage, and serves as evidence of the contract for carriage." *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14, 18–19 (2004).

B.

Contracts for the carriage of goods in maritime often include provisions for the charging of "demurrage and detention" fees, usually by ocean carriers or MTOs. *See generally* Interpretive Rule on Demurrage and Detention Under the Shipping Act (Interpretive Rule), 85 Fed. Reg. 29638 (May 18, 2020); *see also Evergreen Shipping Agency (Am.) Corp. v. Fed. Mar. Comm'n*, 106 F.4th 1113, 1114–15 (D.C. Cir. 2024). Demurrage and detention charges "serve the primary purpose of incentivizing the movement of cargo and promoting freight fluidity." Demurrage and Detention Billing Requirements (Advance Notice of Proposed Rulemaking), 87 Fed. Reg. 8506, 8507 (Feb. 15, 2022). The charges arise when

there is unduly prolonged use of shipping containers or of space in a marine terminal. *See* Final Rule, 89 Fed. Reg. at 14362 (defining "Demurrage or detention"). That causes a scarcity of shipping containers or port space (or both), resulting in congestion in shipping lanes and delays in the movement of cargo. Demurrage and detention fees aim to encourage the availability of containers and port space. *See Evergreen Shipping Agency*, 106 F.4th at 1114–15.

Recent years have seen growing concerns about the amount of demurrage and detention charges and the fairness of their allocation. In terms of the amount of the fees, "[a]s rising cargo volumes have increasingly put pressure on common carriers, port and terminal performance, demurrage and detention charges have . . . substantially increased." *Id.* at 14330. In just the two-year period from 2020 to 2022, for instance, "nine of the largest carriers serving the U.S. liner trades individually charged a total of approximately $8.9 billion in demurrage and detention charges and collected roughly $6.9 billion." Final Rule, 89 Fed. Reg. at 14330.

In terms of the fairness of the allocation of the fees, there have been "years of complaints from U.S. importers, exporters, transportation intermediaries, and drayage [i.e. short-distance] truckers that ocean carrier and marine terminal operator demurrage and detention practices unfairly penalized shippers, intermediaries, and truckers for circumstances outside their control." Interpretive Rule, 85 Fed. Reg. at 29638. There have also been concerns about "a lack of clarity and consistency regarding demurrage and detention practices, policies, and terminology." *Id.* at 29640. The entities against whom charges are assessed—such as shippers—are unclear about "what is being billed by whom." Final Rule, 89 Fed. Reg. at 14330 (quotation marks omitted). And motor carriers, for their part, have raised complaints that they have been billed for

5

demurrage and detention fees even though they "have no contractual relationship with the billing parties" (ocean carriers and MTOs). Demurrage and Detention Billing (Proposed Rule), 87 Fed. Reg. 62341, 62345 (Oct. 14, 2022). Motor carriers have further "noted that billing parties sometimes threatened to prevent [them] from picking up or dropping off containers due to disputes with one of the motor carrier's customers," resulting in their having to "cover the disputed charges in order to serve their other customers." *Id.*

C.

1.

The Federal Maritime Commission, with support from Congress, has sought to address the significant and growing concerns with demurrage and detention charges and practices. In 2020, the Commission adopted an interpretive rule providing that, when assessing the reasonableness of those practices, the Commission generally would "consider the extent to which demurrage and detention are serving their intended primary purposes as financial incentives to promote freight fluidity." Interpretive Rule, 85 Fed. Reg. at 29666. In 2022, Congress built on the Commission's interpretive rule in the Ocean Shipping Reform Act, Public Law 117–146, 136 Stat. 1272. Congress instructed the Commission to "further clarify reasonable rules and practices related to the assessment of detention and demurrage charges to address the issues identified in the" interpretive rule, "*including a determination of which parties may be appropriately billed* for any demurrage, detention, or other similar per container charges." *Id.* § 7(b)(2), 136 Stat. at 1275–76 (codified at 46 U.S.C. § 41102 note) (emphasis added).

Later in 2022, the Commission proposed a rule to carry out Congress's direction to specify which parties can be assessed

6

demurrage and detention charges. Proposed Rule, 87 Fed. Reg. at 62341, 62346. The Commission noted truckers' concerns about being invoiced even though they were not parties to the shipping contracts and about being forced to cover disputed charges as a condition of picking up or dropping off containers. *Id.* at 62345. To address those sorts of concerns, the proposed rule adopted an approach under which "only the person who contracted with the common carrier for the carriage or storage of goods may be issued an invoice." *Id.* at 62349. In the Commission's view, the "current system, in which parties who did not negotiate contract terms with the billing party are nonetheless bound by them, creates additional confusion and hardship and exacerbates problems in the supply chain." *Id.* at 62348. That is in part because "third parties lack direct involvement and information" and thus are not "privy to the demurrage and detention terms negotiated by the parties to the original contractual agreement" (who are usually the ocean carrier and the shipper). *Id.* at 62349. The "proposed rule should simplify the current system and ensure that only the person with the most knowledge about the shipment and who is in the best position to understand and dispute the charge receives a demurrage or detention invoice." *Id.* at 62350.

Even so, the Commission sought comment on one possible exception to its approach of confining invoices only to parties "who contracted with the common carrier": the Commission asked for input on "whether it would be appropriate to also include the consignee named on the bill of lading as another person who may receive a demurrage or detention invoice." *Id.* at 62349–50.

2.

In February 2024, the Commission issued its Final Rule, which we review in this case. Final Rule, 89 Fed. Reg. at

14330. As in the proposed rule, the Final Rule maintains the Commission's emphasis on the existence of a contractual relationship between the billing and billed parties. The Commission characterized its "analytical approach to the rule" in this way: "using contractual relationships as the basis for establishing to whom demurrage and detention invoices should be sent." *Id.* at 14339. The Commission accordingly "determined that prohibiting billing parties from issuing demurrage and detention invoices to persons with whom they do not have a contractual relationship will best benefit the supply chain." *Id.* Specifically, if "the billed party has firsthand knowledge of the terms of its contract, then they are in a better position to ensure that both they and the billing party are abiding by those terms." *Id.* The Commission, though, also followed through on the opening it left in the proposed rule to include consignees as an eligible billed party. *Id.* at 14340–41.

Codifying that approach, the Final Rule states that a "properly issued invoice is a demurrage or detention invoice issued by a billing party to" one of two parties: "(1) The person for whose account the billing party provided ocean transportation or storage of cargo and who contracted with the billing party for" those services (usually the shipper); or "(2) The consignee." *Id.* at 14362. The Rule then reiterates that a "billing party cannot issue an invoice to any other person." *Id.* The Rule also defines "[b]illing party" as "the ocean common carrier, marine terminal operator, or non-vessel-operating common carrier who issues a demurrage or detention invoice." *Id.* And of less relevance here, the Rule sets out the information billing parties must include in invoices, the timeframes for their issuance, and the way to dispute the fee. *Id.* at 14362–63.

8

3.

One comment of note sought clarification from the Commission related to the Final Rule's basic premise that parties in a contractual relationship with a billing party may be issued invoices. The "commenter requested that the Commission amend the definition of 'billed party' to . . . account for situations where VOCCs enter directly into written contracts with motor carriers that use containers in the transportation of goods." *Id.* at 14336. Treating a motor carrier in such a situation as eligible to be billed, even if consistent with the spirit of the Rule's focus on contracting parties, would be in tension with the letter of the Rule: in setting out who may be "properly issued . . . a demurrage or detention invoice," the Rule states that an invoice can go to "[t]he person for whose account the billing party provided ocean transportation or storage of cargo and who contracted with the billing party for" those services. *Id.* at 14362. A motor carrier, even if contracting directly with an ocean carrier, would not be a "person for whose account the billing party provided *ocean transportation or storage of cargo*." *Id.* (emphasis added).

Nonetheless, the Commission responded to the comment by clarifying that a motor carrier in a contractual relationship with an ocean carrier could be billed:

> [A] primary purpose of this rule is to stop demurrage and detention invoices from being sent to parties who did not negotiate contract terms with the billing party. *That concern is not present where a motor carrier has directly contracted with a VOCC.* Nothing in this rule . . . prohibits a VOCC from issuing a demurrage or detention invoice to a motor carrier when a contractual relationship exists

> between the VOCC and the motor carrier for
> the motor carrier to provide carriage or storage
> of goods to the VOCC.

*Id.* (emphasis added).

Less than three months after issuing the Rule, however, the Commission issued a "Correction" in which it clarified that motor carriers in fact are *not* billable parties under the Rule regardless of any contractual relationship with an ocean carrier. Demurrage and Detention Billing Requirements (Correction), 89 Fed. Reg. 39569, 39569–70 (May 9, 2024). The Commission stated that it had "received several inquiries concerning a possible discrepancy between the rule text and one paragraph in the preamble"—i.e. the paragraph in which it responded to the comment as quoted above. *Id.* at 39569. The Commission "now reiterate[d] that . . . demurrage and detention should be billed to either the person for whose account the billing party provided ocean transportation or storage of cargo and who contracted with the billing party for" those services, "or the consignee." *Id.* at 39570. To that end, the Commission characterized its seeming deviation from the strict terms of the Rule in its initial response to the comment as "inadvertent," and it sought to "correct[]" the comment response to convey that motor carriers cannot be billed even if they are in a contractual relationship with the billing party. *Id.*

## II.

The petitioning party before us, the World Shipping Council (WSC), raises three challenges to the Final Rule. First, WSC contends that the Rule is contrary to Congress's instructions and the Commission's statutory authority. Second, WSC argues that the Rule is arbitrary and capricious for various reasons, including that it is internally inconsistent. Third, WSC submits that the Commission violated its

obligations under the National Environmental Policy Act in promulgating the Rule.

We agree with WSC's second argument: we conclude that the Rule is arbitrary and capricious because the Commission failed to explain the seeming inconsistency between its contractual-privity-based rationale and its categorical bar against billing motor carriers even when in privity with the billing party. Accordingly, we grant WSC's petition and set aside the relevant portion of the Rule. And because we grant WSC's petition for review on that basis, we have no occasion to reach WSC's other challenges.

## A.

We have jurisdiction to review rules issued by the Commission. *See* 28 U.S.C. § 2342(3)(B). The Commission, though, contests WSC's standing to seek review in this case. That challenge fails.

WSC is a trade association representing a large share of ocean carriers who provide maritime carriage. The Commission submits that WSC's briefing did not adequately demonstrate how its members will be tangibly harmed by the Rule. But "there is ordinarily little question that" a party regulated by a challenged rule has standing to challenge it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992). WSC's standing is self-evident: it represents entities who are undisputedly regulated by the Rule, the entire object of which is to regulate fees levied by ocean carriers. And at any rate, WSC has since provided affidavits from members alleging specific injuries flowing from the Rule. WSC plainly has standing.

11

B.

We review the Commission's Final Rule under the Administrative Procedure Act's arbitrary-and-capricious standard. *See* 5 U.S.C. § 706(2)(A). That standard is deferential, but it is unmet if an agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy arbitrary-and-capricious review, an agency must at least reasonably explain its decision, *e.g., FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021), and "[o]f course, it would be arbitrary and capricious for the agency's decision making to be 'internally inconsistent,'" *Nat. Res. Def. Council v. U.S. Nuclear Reg. Comm'n*, 879 F.3d 1202, 1214 (D.C. Cir. 2018) (citation omitted). Judged by those criteria, the Commission's explanation of the Final Rule falls short.

Throughout the rulemaking process, from the proposed rule, to the Final Rule, to its defense of the Rule in our court, the Commission's central organizing principle has been that demurrage and detention charges should be assessable against—and only against—entities in contractual privity with the billing parties. As the Commission summarized its reasoning in its briefing to our court, parties to shipping contracts "would likely have greater knowledge of such contracts and a greater ability to evaluate and potentially dispute demurrage and detention charges." FMC Br. 32; *see also* Proposed Rule, 87 Fed. Reg. at 62348–50; Final Rule, 89 Fed. Reg. at 14336, 14338, 14339, 14340, 14341, 14356, 14357; Correction, 89 Fed. Reg. at 39570. The "Commission's

analytical approach to the rule," in short, "us[es] contractual relationships as the basis for establishing to whom demurrage and detention invoices should be sent." Final Rule, 89 Fed. Reg. at 14339.

Even so, the Rule still prohibits ocean carriers from invoicing their partners in contractual relationships in one notable situation: if the billed party is a motor carrier. The Commission had been advised that "motor carrier[s] often sign[]" contracts "that obligate [them] to pay detention and demurrage charges if certain terms of the contract are not met." WSC, Comment in the matter of Demurrage and Detention Billing Requirements (Dec. 13, 2022) (J.A. 213); *see, e.g.*, *Evergreen Shipping Agency*, 106 F.4th at 1115, 1117. Yet while the Rule otherwise allows invoicing an entity in contractual privity with the billing party, it does not do so for a motor carrier. The seeming discrepancy was pointed out to the Commission, and the Commission gave no reasonable explanation for it. To the contrary, to the extent the Commission engaged with whether the Rule's rationale should allow for invoicing a motor carrier in privity with the billing party, the Commission reached the opposite conclusion from the one dictated by the Rule.

Recall that when a commenter raised the issue with the Commission, the Commission's initial response fully endorsed the understanding that the Rule's basic logic supported issuing demurrage and detention charges to truckers in a contractual relationship with ocean carriers. The Commission went so far as to say—at least initially—that the Rule should be understood to allow it. In the Commission's own words, "a primary purpose of this rule is to stop demurrage and detention invoices from being sent to parties who did not negotiate contract terms with the billing party," and "[t]hat concern is not present where a motor carrier has directly contracted with a VOCC." Final

Rule, 89 Fed. Reg. at 14336. The Commission felt so certain on that score that it assured: "Nothing in this rule, either in the proposed or final version, prohibits a VOCC from issuing a demurrage or detention invoice to a motor carrier when a contractual relationship exists between the VOCC and the motor carrier for the motor carrier to provide carriage or storage of goods to the VOCC." *Id.*

As it happened, though, something in the Rule *did* prohibit invoicing a trucker even if it is in a contractual relationship with an ocean carrier: the terms of the Rule allowed invoicing a party who "contract[s] with the billing party" for "*ocean* transportation," Final Rule, 89 Fed. Reg. at 14362 (emphasis added)—not, as the Commission's response to the comment had assumed, when a party contracts to "provide carriage" more broadly—i.e., over land, *id.* at 14336. And the Rule goes on to specify that a "billing party cannot issue an invoice to any other person." *Id.* at 14362. The Commission thus issued its "correction" clarifying that the Rule would not allow ocean carriers to issue demurrage and detention invoices to motor carriers with whom they are in contractual privity. Correction, 89 Fed. Reg. at 39570.

Critically for our purposes, however, the Commission's brief (less than one full page) clarification nowhere explains why its initial response—that the central logic of its Rule should allow for invoicing motor carriers who are in contractual privity—did not remain entirely persuasive. After all, in that situation the trucker has precisely the kind of first-hand information from negotiating the contract that the Commission views to be vital to allowing imposition of demurrage and detention fees. Yet the Commission said nothing in its clarification that calls into question—or even engages with—the substance of its previous response in that regard.

Instead, the Commission summarily "reiterate[d]" that the Rule allows for billing only "the person for whose account the billing party provided ocean transportation or storage of cargo" (or a consignee). *Id*. But restating the *terms* of the Rule does not explain why the *logic* of the Rule does not extend to truckers in contractual privity, as the Commission had initially assumed it did. The Commission also posited in passing that its jurisdiction may not extend to contracts between ocean carriers and motor carriers not based on a through bill of lading. *See id.* That supposition, too, is unresponsive: the entire object of the comment was to point out that, even when ocean carriers and motor carriers contract for the inland transportation of cargo based on a through bill of lading, the Rule still prohibits the issuance of demurrage and detention charges against motor carriers without explanation.

In its brief defending the Final Rule in our court, the Commission observes that those concerns could be mitigated if an invoiced shipper or consignee, after being billed for delays caused by a motor carrier, then sought to recover compensation from the motor carrier. *See* FMC Br. 36; Final Rule, 89 Fed. Reg. at 14336, 14341. WSC, though, disputes that invoiced shippers or consignees could successfully recover charges from motor carriers with whom they have no relationship, contractual or otherwise. WSC Br. 18–19. At any rate, regardless of the feasibility of recovering invoiced charges from motor carriers, the existence of that possibility as a conceptual matter does nothing to explain why the Commission would prohibit directly billing motor carriers who are in contractual privity with the billing party—when the "overall approach" of its Rule relies on "contractual relationships as the basis for establishing to whom demurrage and detention invoices should be sent." Final Rule, 89 Fed. Reg. at 14339.

In short, when faced with a seeming discrepancy in the reach of the Rule given its underlying rationale, the Commission acknowledged—even embraced—the existence of the evident inconsistency but gave no reasonable justification for it. None of this is to say definitively that the Commission could never give a satisfactory explanation for categorically excluding motor carriers from the field of parties that may be assessed demurrage and detention fees, should the Commission opt to maintain that policy. Rather, it is to say that the Commission has yet to give such an explanation.

That alone suffices to require setting aside the Rule. But it also bears noting that the Rule raises questions in the opposite direction as well: while the Rule is seemingly *under*inclusive in *dis*allowing issuance of an invoice to a motor carrier who is in contractual privity with an ocean carrier, there are also questions about whether the Rule is *over*inclusive in *allowing* issuance of an invoice to parties who are *not* in contractual privity. While WSC does not challenge the Rule's application to consignees, the Rule raises questions on that score that form part of the context for judging the soundness of the Rule and of the Commission's efforts to explain its reach.

With respect to consignees—"the ultimate recipient of the cargo"—the Rule expressly allows issuing a demurrage or detention invoice to them as an alternative to invoicing a contracting party such as a shipper. Final Rule, 89 Fed. Reg. at 14362. By the terms of the Rule, the option to bill the consignee appears to be categorical: the Rule states that a "properly issued invoice" is one "issued by a billing party to . . . [t]he consignee," without qualification. *Id.* It would appear not to matter, then, whether the consignee is in some sort of contractual relationship with the billing party. Regardless, the consignee can be subject to a demurrage or detention charge. In that sense, the Rule's inclusion of

consignees among eligible billed parties, without regard to contractual privity, might be seen to stand in some tension with the Commission's focus on the existence of a contractual relationship as a necessary precondition for assessing demurrage or detention fees.

There may well be sound explanations for allowing billing of consignees even absent privity, but the Commission's account of its decision to include consignees—which is found in the Rule's preamble—does not attempt to provide one. To the contrary, that account—somewhat confusingly—says that the Rule "allow[s] consignees to be billed as an alternative to the shipper *when the consignee is the party contracting for the shipping*." *Id.* at 14340 (emphasis added). In other words, "it is the consignee's contractual privity . . . that determines whether the consignee can be billed." *Id.* Yet there is no indication in the Rule itself that the option to bill consignees is confined in that way.

The Rule seems quite clearly to indicate otherwise: it first gives the option of invoicing a party "*who contracted with the billing party* for . . . ocean transportation or storage of cargo"— i.e., a contracting shipper, and it then gives the fallback option of billing "[t]he consignee," with no comparable limiting language requiring that the consignee "contracted with the billing party." *Id.* at 14362 (emphasis added). To the same effect, in the preamble discussion immediately following the Commission's seemingly confusing statements that consignees can be billed only if they are in contractual privity, the Commission characterizes the Rule as follows: "Outside of the exception for consignees, billing parties must not send invoices to third parties," a statement that assumes that billed consignees are "third parties"—i.e., *non-contracting* parties. *Id.* at 14341. In the end, there would seem to be questions about the reach of the Commission's inclusion of consignees as a billing option.

Ultimately, regardless of any uncertainties about whether the Rule permits billing a non-contracting consignee, the Rule's bar against billing a contracting motor carrier itself suffices to require setting the Rule aside as arbitrary and capricious. And because petitioners draw no distinction among their various challenges to the Rule in terms of the relief they seek, and in light of petitioners' confirmation in oral argument that they see no reason to reach their other grounds for invalidating the Rule if they prevail on their arbitrary-and-capricious claim, *see* Oral Argument at 10:50–11:13, 53:39–54:14, we have no need to consider petitioners' other challenges.

## C.

As for the remedy, we are unable to grant the Commission's suggestion of a remand without vacatur because the Rule's invalidity does not stem from a minor procedural error and because the agency has not provided evidence of significant disruptive effects from a vacatur. *See* FMC Br. 41 n.5. At the same time, there is no need to invalidate the Rule in its entirety given the scope of WSC's challenge. Instead, we will sever the challenged portion of the regulation—46 C.F.R. § 541.4, which confines the field of properly billed parties to contracting shippers or consignees—and leave the remainder of the regulation intact. *See, e.g.*, *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019).

In assessing whether a rule can be severed in that kind of fashion, we first ask whether "the agency would have adopted the same disposition regarding the unchallenged portion [of the regulation] if the challenged portion were subtracted." *Sierra Club v. FERC*, 867 F.3d 1357, 1366 (D.C. Cir. 2017) (citation omitted). Here, the answer is yes. Especially in light of the Commission's initial assumption that the Rule did *not*

categorically bar the billing of motor carriers, there is good reason to believe it would have adopted the remainder of the Rule regardless of the description of who can be billed in § 541.4. The remaining provisions in the Rule, moreover, do meaningful work: they set out the information that must be included in invoices and the timeline and procedures for dispute resolution, all of which the Commission considered to be important and productive aspects of the response to the substantial concerns about demurrage and detention practices. Final Rule, 89 Fed. Reg. at 14362–63.

Second, we assess whether the remaining parts of the Rule would "function sensibly without the stricken provision." *Sorenson Commc'ns. Inc. v. FCC*, 755 F.3d 702, 710 (D.C. Cir. 2014) (quoting *MD/DC/DE Broads. Ass'n v. FCC,* 236 F.3d 13, 22 (D.C. Cir. 2001)). That requirement, too, is satisfied here. All the remaining provisions can function entirely independently of § 541.4 of the regulation, and none of them references § 541.4 or relies on it in any way. We thus will sever and set aside the provision of the Rule establishing § 541.4 and leave the remainder of the Rule in effect.

\* \* \* \* \*

For the foregoing reasons, we grant the petition for review and set aside the Rule in part as set forth in this opinion.

*So ordered.*